MISSISSIPPI POWER & LIGHT CO. *v.* MISSISSIPPI
EX REL. MOORE, ATTORNEY GENERAL
OF MISSISSIPPI, ET AL.

No. 86–1970.   Argued February 22, 1988—Decided June 24, 1988

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and KENNEDY, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 377. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 383.

*Rex E. Lee* argued the cause for appellant. With him on the brief were *George L. Saunders, Jr., David W. Carpenter, Robert R. Nordhaus, Howard E. Shapiro,* and *James K. Child, Jr.*

*Deputy Solicitor General Cohen* argued the cause for the United States et al. as *amici curiae* urging reversal. With

him on the brief were *Solicitor General Fried, Richard J. Lazarus, Catherine C. Cook,* and *Jerome M. Feit.*

*John L. Maxey II* argued the cause for appellees. With him on the brief for appellee State of Mississippi were *Mike Moore,* Attorney General, *Frank Spencer,* Assistant Attorney General, and *W. Glenn Watts,* Special Assistant Attorney General. *Jesse C. Pennington* and *Lewis Burke* filed a brief for appellee Mississippi Legal Services Coalition.*

JUSTICE STEVENS delivered the opinion of the Court.

On July 1, 1985, Grand Gulf Unit 1, a major nuclear power-plant located in Port Gibson, Mississippi, began commercial operations. An order entered by the Federal Energy Regulatory Commission (FERC) required Mississippi Power and Light Company (MP&L) to purchase 33% of the plant's output at rates determined by FERC to be just and reasonable. The Mississippi Public Service Commission (MPSC) subsequently granted MP&L an increase in its retail rates to enable it to recover the cost of its purchases of Grand Gulf power. On appeal, the Mississippi Supreme Court held that it was error to grant an increase in retail rates without first examining the prudence of the management decisions that led to the construction and completion of Grand Gulf 1. The question presented to us is whether the FERC proceedings have pre-empted such a prudence inquiry by the State Commission. For reasons similar to those set forth in *Nantahala*

---

*Briefs of *amici curiae* urging affirmance were filed for the Consumer Federation of America et al. by *Scott Hempling* and *Roger Colton;* for the National Association of State Utility Consumer Advocates by *Raymon E. Lark, Jr., Elizabeth Elliot,* and *Steven W. Hamm;* and for the National Governors' Association et al. by *Benna Ruth Solomon* and *Robert H. Loeffler.*

Briefs of *amici curiae* were filed for the Council of the city of New Orleans by *Clinton A. Vince;* for the Arkansas Public Service Commission et al. by *Steve Clark,* Attorney General of Arkansas, and *Mary B. Stallcup,* Deputy Attorney General, *Wallace L. Duncan, James D. Pembroke,* and *J. Cathy Fogel;* and for the Edison Electric Institute by *James B. Liberman,* and *Robert L. Baum.*

*Power & Light Co.* v. *Thornburg*, 476 U. S. 953 (1986), we conclude that the state proceedings are pre-empted and therefore reverse.

## I

MP&L is one of four operating companies whose voting stock is wholly owned by Middle South Utilities (MSU), a public utility holding company.[1]  The four companies are engaged both in the wholesale sale of electricity to each other and to companies outside the MSU system and in the retail sale of electricity in separate service areas in Louisiana, Arkansas, Missouri, and Mississippi.  Through MSU the four companies operate as an integrated power pool, with all energy in the entire system being distributed by a single dispatch center located in Pine Bluff, Arkansas.  Wholesale transactions among the four operating companies historically have been governed by a succession of three "System Agreements," which were filed with FERC in 1951, 1973, and 1982. The System Agreements have provided the basis for planning and operating the companies' generating units on a single-system basis and for equalizing cost imbalances among the four companies.

The retail sales of each of the operating companies are regulated by one or more local regulatory agencies.  For example, Arkansas Power and Light Company (AP&L) sells in both Arkansas and Missouri and therefore is regulated by both the Arkansas Public Service Commission and the Missouri Public Service Commission.  MP&L's retail rates are subject to the jurisdiction of the MPSC.

Through the 1950's and into the 1960's, most of the MSU system's generating plants were fueled with oil or gas.  In the late 1960's, the MSU system sought to meet projected increases in demand and to diversify its fuel base by adding coal and nuclear generating units.  It was originally contem-

---

[1] The other operating companies owned by MSU are Louisiana Power and Light (LP&L), New Orleans Public Service, Inc. (NOPSI), and Arkansas Power and Light Company (AP&L).

plated that each of the four operating companies would finance and construct a nuclear power facility.[2] Consistent with this scheme, MP&L was assigned to construct two nuclear power facilities at Port Gibson, Mississippi, Grand Gulf 1 and 2.[3] The Grand Gulf project, however, proved too large for one operating company to finance. MSU therefore formed a new subsidiary, Middle South Energy, Inc. (MSE), to finance, own, and operate Grand Gulf. MSE acquired full title to Grand Gulf, but hired MP&L to design, construct, and operate the facilities.

In April 1974, MSE and MP&L applied to MPSC for a certificate of public convenience and necessity authorizing the construction of the plant. The State Commission granted the certificate, noting that MP&L was part of "an integrated electric system" and that "the Grand Gulf Project [would] serve as a major source of baseload capacity for the company and the entire Middle South System pooling arrangement."[4] App. to Motion to Dismiss 36–37.

---

[2] Prior to the events that gave rise to the instant controversy, each generating unit on the system was owned, financed, constructed, and operated by a single operating company despite the fact that new generating units were planned and constructed in accordance with the needs of the system as a whole, not merely the needs of the particular operating company. Middle South Energy, Inc., 31 FERC ¶ 61,305, p. 61,653 (1985).

[3] Originally, AP&L was assigned to build and operate two nuclear facilities in Arkansas, ANO 1 and ANO 2; LP&L undertook the construction of Waterford 3 and 4; MP&L was assigned to build and operate Grand Gulf 1; and NOPSI was to construct a unit near New Orleans. Although the two ANO units were completed without incident, regulatory delays, additional construction requirements, and severe inflation led to serious problems in the construction of the remaining units. Plans to construct Waterford 4 quickly failed and severe costs overruns marred the completion of Waterford 3. The site for the NOPSI facility proved unsuitable and responsibility for construction of that unit, Grand Gulf 2, was transferred to MP&L.

[4] The MPSC's Order Granting Certificate of Public Convenience and Necessity reflected the MPSC's appreciation of the interstate dimensions of the MSU system. It stated, in part:

"Middle South Utilities, Inc. ('Middle South') is a holding company registered under the Public Utility Holding Company Act of 1935. It owns all

By the late 1970's it became apparent that systemwide demand in the ensuing years would be lower than had been forecast, making Grand Gulf's capacity unnecessary. Moreover, regulatory delays, additional construction requirements, and severe inflation frustrated the project. Management decided to halt construction of Grand Gulf 2, but to complete Grand Gulf 1, largely on the assumption that the relatively low cost of nuclear fuel would make the overall cost of Grand Gulf power per kilowatt hour lower than that of alternative energy sources. As it turned out, however, the cost of completing Grand Gulf construction was about six times greater than had been projected.[5] Consequently, the

of the outstanding common stock of each of its principal operating subsidiaries: Arkansas Power & Light Company (Arkansas), Arkansas-Missouri Power Company (Ark-Mo), Louisiana Power & Light Company (Louisiana), [MP&L], and New Orleans Public Service Inc. (NOPSI). . . . Middle South and all of its subsidiaries constitute the Middle South Utilities System (Middle South System). The electric properties of the System operating companies constitute an integrated public utility system.

.          .          .          .          .

"The generating facilities of the Middle South System have been strategically located with a reference to the availability of fuel, protection of local loads and other controlling economic factors. The size of these units has been determined basically by the projected load growth of the Middle South System. [MP&L's] present rate and capital structure obviously cannot support construction of this magnitude.

"In order to finance this construction on a basis that will be in the best interests of both its investors and the investors in its subsidiaries, and to insure adequate and dependable electric service to the customers and service areas of its subsidiaries, including Company, and without unnecessarily complicating its financial structure, Middle South [Middle South Energy, Inc.] has been organized." App. to Motion to Dismiss 27–28, 30–31.

[5] It was originally estimated that the cost per kilowatt of capacity would be about $500; by the time commercial operations began, that cost amounted to $2,933. The original estimate for the cost of two nuclear units at Port Gibson was approximately $1.2 billion. Regulatory delays, additional construction requirements imposed after the Three Mile Island disaster, and severe inflation, however, ran up Grand Gulf costs to more than $3 billion for the single unit. See *Mississippi Industries* v. *FERC*, 257 U. S. App. D. C. 244, 250, 808 F. 2d 1525, 1531 (1987).

wholesale cost of Grand Gulf's power greatly exceeds that of power produced in other system facilities.

The four operating companies considered various methods of allocating the cost of Grand Gulf's power. In 1982 MSU filed two agreements with FERC. The first was a new System Agreement, which set forth the terms and conditions for coordinated operations and wholesale transactions among the four companies, including a scheme of "capacity equalization payments," which were designed to ensure that each company contribute proportionately to the total costs of generating power on the system. Transactions related to the purchase of power from Grand Gulf 1, however, were not included in the 1982 System Agreement. The second agreement filed with FERC was the Unit Power Sales Agreement (UPSA), which provided wholesale rates for MSE's sale of Grand Gulf 1 capacity and energy. Under the UPSA, AP&L was not obligated to purchase any of Grand Gulf's capacity; LP&L was obligated to purchase 38.57%, NOPSI 29.8%, and MP&L 31.63%.

## The FERC Proceedings

FERC assigned the agreements to two different Administrative Law Judges, who were charged with the task of determining whether the agreements were "just and reasonable" within the meaning of the Federal Power Act.[6]  Ex-

---

[6] Section 205 of the Federal Power Act declares unlawful any rate charged in any transaction within FERC's jurisdiction that is not just and reasonable.  49 Stat. 851, as amended, 16 U. S. C. § 824d(a).  Section 206 of the Act provides that when FERC determines after a hearing that

"any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order."  16 U. S. C. § 824e(a).

Because FERC determined that the UPSA allocating Grand Gulf power among the four operating companies was a contract affecting the wholesale

tensive hearings were held by each ALJ, in which numerous parties representing consumer interests and the various state regulatory agencies participated. Both judges concluded that because Grand Gulf was designed to serve the needs of the entire MSU system, the failure to distribute the costs associated with Grand Gulf among all members of the system rendered the agreements unduly discriminatory and that costs should be allocated in proportion to each company's relative system demand.[7]  *Middle South Services, Inc.*, 30

---

rates of those operating companies, § 206 of the FPA imposed on FERC an obligation to fix terms that would render the contract "just and reasonable." See *Mississippi Industries,* 257 U. S. App. D. C., at 259–260, 808 F. 2d, at 1540–1541.

[7] Administrative Law Judge Liebman, who reviewed the UPSA, "concluded that the evidence was overwhelming that the Middle South system is a single integrated and coordinated electric system operating in Louisiana, Mississippi, Arkansas, and Missouri. He found that the Grand Gulf project was initiated in the 1970's to meet the then projected load demand of the *system* and not just the load of any Middle South operating company or companies, and further that every unit on the Middle South system had been constructed to meet system load. Therefore, he concluded that the costs of Grand Gulf capacity and energy should be shared equitably by all four operating companies and their customers" and that the allocations in the UPSA were "unjust, unreasonable and unduly discriminatory." *Middle South Energy, Inc.,* 31 FERC, at 61,632–61,633 (emphasis in original); *Middle South Energy, Inc.,* 26 FERC ¶ 63,044, pp. 65,106–65,108 (1984). He concluded that the allocation proposal submitted by the Louisiana Public Service Commission was the most equitable. Under that proposal each operating company would be allocated a share of the cost of nuclear capacity on the MSU system roughly in proportion to each company's relative share of system demand, as fixed in 1982. *Id.,* at 65,109. This approach allocated 33% of Grand Gulf's capacity costs to MP&L, a percentage slightly higher than that contained in the UPSA, which had distributed costs among only three of the operating companies.

Administrative Law Judge Head, who presided in the proceedings involving the 1982 System Agreement, advocated equalizing production costs on the basis of annual demand. Although he characterized Grand Gulf as an "anomaly," he reached conclusions similar to ALJ Liebman's about the relationship of Grand Gulf to the system:

"[Grand Gulf] was planned, licensed, and constructed as a *system* plant, intended to supply power not only in Mississippi but throughout the entire

FERC ¶ 63,030, pp. 65,170–65,173 (1985) (1982 System Agreement); *Middle South Energy, Inc.*, 26 FERC ¶ 63,044, pp. 65,105–65,108 (1984) (UPSA).

FERC consolidated the decisions of the Administrative Law Judges for review and issued its decision in June 1985. *Middle South Energy, Inc.*, 31 FERC ¶ 61,305. The Commission acknowledged that it had before it difficult cost allocation issues and that there were "no easy answers." After extensive review, FERC concluded that the most equitable result would be to adopt ALJ Liebman's formula for allocating Grand Gulf costs.

The Commission affirmed and adopted the findings of the Administrative Law Judges that MSU is a highly integrated and coordinated power pool. It concluded that the result of this integration and coordination was "planning, construction, and operations which [were] conducted primarily for the system as a whole." *Id.*, at 61,645. Because it found that

---

MSU system. . . . [T]he financial responsibility and production cost responsibility for Grand Gulf should be borne by all the operating companies. . . .

". . . Grand Gulf [should be integrated] into the 1982 System Agreement by having each of the four operating companies pay for the production costs of the Grand Gulf facility based on the ratio that the individual operating company's total annual demand bears to the total annual system demand." *Middle South Services, Inc.*, 30 FERC ¶ 63,030, p. 65,172 (1985) (emphasis added).

Both judges considered and rejected MP&L's proposition that costs should be allocated in accordance with the 1973 System Agreement. Under the 1973 Agreement, the cost to be borne by each operating company would depend on the percentage of Grand Gulf capacity that company needed to meet the demands of its customers. Thus companies owning capacity sufficient to meet their needs, "long" companies, would not bear any of the cost while "short" companies, companies that have to purchase additional capacity to meet their needs, would bear the total cost. Responsibility would shift as particular operating companies became "shorter" or "longer." Since MP&L is predicted to be a long company until sometime in the 1990's, under the 1973 System Agreement, it would not have had to bear any costs associated with Grand Gulf until depreciation had substantially reduced the cost of Grand Gulf power.

nuclear units on the System had been "planned to meet over-all System needs and objectives," it concluded "that some form of equalization of nuclear plant costs [was] necessary to achieve just, reasonable, and non-discriminatory rates among the MSU operating companies." *Id.*, at 61,655. The Commission agreed with the judges that the 1982 System Agreement and the UPSA as filed would not together produce proper cost allocation, but concluded that the 1982 System Agreement in conjunction with ALJ Liebman's allocation of capacity costs associated with Grand Gulf would "achieve just and reasonable results." *Ibid.* Thus FERC affirmed the allocation of 33% of Grand Gulf's capacity costs to MP&L as just and reasonable. Although it did not expressly discuss the "prudence" of constructing Grand Gulf and bringing it on line, FERC implicitly accepted the uncontroverted testimony of the MSU executives who explained why they believed the decisions to construct and to complete Grand Gulf 1 were sound, and approved the finding that "continuing construction of Grand Gulf Unit No. 1 was prudent because Middle South's executives believed Grand Gulf would enable the Middle South system to diversify its base load fuel mix and, it was projected, at the same time, produce power for a total cost (capacity and energy) which would be less than existing alternatives on the system." 26 FERC, at 65,112–65,113; see 31 FERC, at 61,666 (affirming ALJ Liebman's decision to the extent not modified).

The Commission later clarified certain aspects of its previous order in the course of considering several petitions for rehearing. It rejected contentions that its exercise of jurisdiction would destroy effective state regulation of retail rates. Specifically, FERC rejected claims that it could not exercise jurisdiction because such action would result in States being "precluded from judging the prudence of Grand Gulf costs and denied any say in the rate of return imposed as part of these costs" and "imping[e] on the State's paramount

authority in certification decisions regarding need, type, and costs of construction of new generating facilities." *Middle South Energy, Inc.*, 32 FERC ¶ 61,425, p. 61,951 (1985). FERC asserted that its opinion was "the result of a careful balancing of the state and Federal interests involved" and that it had paid "careful heed to the impact [its] decision would have on the states." *Id.*, at 61,951–61,952. FERC went on to reject the argument that allocation of Grand Gulf costs should be based on whether individual companies *needed* Grand Gulf capacity. Since Grand Gulf had been constructed to meet the needs and serve the goals of the entire system, FERC reasoned that "the allocation of Grand Gulf power must rest not on the 'needs' of an individual company, but rather on the principles of just, reasonable, non-discriminatory, and non-preferential rates." *Id.*, at 61,958. FERC emphasized that the parties had entered the pooling agreement voluntarily and that its decision did no more than "alter in as limited a means as possible the agreed-upon cost scheme, in order to achieve just, reasonable, non-discriminatory and non-preferential rates." *Id.*, at 61,961.

On review, the United States Court of Appeals for the District of Columbia Circuit affirmed FERC's order that the four operating companies share the cost of the system's investment in nuclear energy in proportion to their relative demand for energy generated by the system as a whole. The court first rejected various challenges to FERC's authority to restructure the parties' agreed-upon allocations, holding that the Federal Power Act (FPA) gave FERC the necessary authority. The court then affirmed FERC's allocation of Grand Gulf capacity and costs as both rational and within the Commission's range of discretion to remedy unduly discriminatory rates. *Mississippi Industries* v. *FERC*, 257 U. S. App. D. C. 244, 285, 808 F. 2d 1525, 1566 (1987).[8]

---

[8] Judge Bork agreed with most of the majority's decision but dissented from the panel's affirmance of FERC's specific allocation of Grand Gulf costs on the ground that FERC had failed adequately to explain its criteria

*The State Proceedings*

On November 16, 1984, before the FERC proceedings were completed, MP&L filed an application for a substantial increase in its retail rates. The major portion of the requested increase was based on the assumption that MP&L would be required to purchase 31.63% of the high-cost Grand Gulf power when the unit began operating on July 1, 1985, in accordance with the terms of the UPSA. After public hearings, on June 14, 1985, the Mississippi Commission entered an order allowing MP&L certain additional revenues, but denying MP&L any retail rate relief associated with Grand Gulf Unit 1. App. to Juris. Statement 33a.

On June 27, 1985, MP&L applied for rehearing of the order insofar as it denied any rate relief associated with Grand Gulf. As expected, Grand Gulf went on line on July 1, 1985, and MP&L became obligated consistent with FERC's allocation to make net payments of about $27 million per month for Grand Gulf capacity. After public hearings on the rehearing petition, the MPSC found that MP&L would become insolvent if relief were not granted and allowed a rate increase to go into effect to recover a projected annual revenue de-

---

for determining undue discrimination and why the allocation it adopted was not unduly discriminatory. The panel voted to deny rehearing, but the court granted rehearing en banc to consider the issues raised by the dissent and vacated the portions of the panel opinion concerning the specific allocation of costs. *Mississippi Industries* v. *FERC*, 259 U. S. App. D. C. 244, 814 F. 2d 773 (1987). Later, the en banc court vacated its order granting rehearing. 262 U. S. App. D. C. 41, 822 F. 2d 1103 (1987). At the same time, the panel vacated its order denying rehearing, granted rehearing, reversed FERC's order, vacated the part of its opinion concerning specific cost allocations, and remanded to FERC for reconsideration of the decision to equalize capacity costs and for an explanation of what constitutes undue discrimination and why FERC's order was not unduly discriminatory. *Mississippi Industries* v. *FERC*, 262 U. S. App. D. C. 42, 822 F. 2d 1104 (1987). On remand, FERC has issued an opinion reaffirming and further explaining the basis for its previous allocation. See *System Energy Resources, Inc.*, 41 FERC ¶ 61,238 (1987).

ficiency of about $327 million. The increase was predicated entirely on the company's need for revenues to cover the purchased power expenses associated with Grand Gulf 1. See *id.*, at 39a.

In its order the MPSC noted that petitions for rehearing were pending before FERC, in which the MPSC was continuing to challenge the allocation of 33% of Grand Gulf's power to MP&L. *Id.*, at 28a. It stated that it intended "to vigorously pursue every available legal remedy challenging the validity and fairness of the FERC allocation to MP&L," *id.*, at 51a, and that appropriate rate adjustments would be made if that allocation was changed. The order made no reference to the prudence of the investment in Grand Gulf.

The Attorney General of Mississippi and certain other parties representing Mississippi consumers appealed to the Mississippi Supreme Court. Under Mississippi law, the MPSC has authority to establish just and reasonable rates which will lead to a fair rate of return for the utility. Miss. Code Ann. § 77–3–39 (Supp. 1987). "A fair return is one which, under prudent and economical management, is just and reasonable to both the public and the utility." *Southern Bell Tel. & Tel. Co.* v. *Mississippi Public Service Comm'n*, 237 Miss. 157, 241, 113 So. 2d 622, 656 (1959); *Mississippi Public Service Comm'n* v. *Mississippi Power Co.*, 429 So. 2d 883 (Miss. 1983). The appealing parties charged, *inter alia*, that the MPSC had exceeded the scope of its authority by adopting "retail rates to pay Grand Gulf expenses without first determining that the expenses were prudently incurred." *Mississippi ex rel. Pittman* v. *Mississippi Public Service Comm'n*, 506 So. 2d 978, 979 (Miss. 1987). The State Supreme Court agreed, rejecting the argument that requiring the MPSC to review the prudence of incurring costs associated with Grand Gulf would violate the Supremacy Clause of the United States Constitution. The court concluded that MP&L and its sister and parent companies were

"using the jurisdictional relationship between state and federal regulatory agencies to completely evade a prudency review of Grand Gulf costs" by either state or federal agencies and remanded the case to the MPSC for further proceedings. The court held that FERC's determination that MP&L's assumption of a 33% share of the costs associated with Grand Gulf would be fair to its sister operating companies did not obligate the State to approve a pass-through of those costs to state consumers without a prudence review.[9]

The court rejected MP&L's argument that the decision of this Court in *Nantahala Power & Light Co.* v. *Thornburg*, 476 U. S. 953 (1986), which barred the State of North Carolina from setting retail rates that did not take into account FERC's allocation of power between two related utility companies, foreclosed a state prudence review. *Nantahala*, the state court concluded, simply did not force the "MPSC to set rates based on the construction and operation of a plant (nuclear or otherwise) that generates power that is not needed at a price that is not prudent." 506 So. 2d, at 985. The court assumed that only the fact that Grand Gulf was owned by an out-of-state corporation as opposed to MP&L created a

---

[9] The court pointed out that approval to build Grand Gulf in the State of Mississippi had been secured on the strength of certain assumptions: "the first unit was to be operational in 1980, the two units were to cost $1.227 billion, and Mississippi ratepayers were not to pay for any more of its capacity than they needed." 506 So. 2d, at 984. Reliance on these assumptions proved unjustified: "Unit 1 began operation in July, 1985; the cost of Unit 1 alone, was over $3.5 billion; and the MSU-controlled operating companies agreed, among themselves that Mississippians should pay for 1/3 of its cost." *Ibid.* (emphasis omitted). Of course, the failure of the assumptions made by both MP&L and the State at the time construction of Grand Gulf was approved has little to do with the pre-emption question before us. We note, however, that the failure was not the result of any deception on the part of MP&L, MSU, or MSE. At the time construction of Grand Gulf was initiated, no one anticipated the enormous cost overruns that would be associated not only with that plant but also with virtually every nuclear power facility being constructed in the United States. See nn. 2 and 5, *supra.*

question whether a state prudence determination was preempted and concluded that that fact was not enough to rob it of authority. The court distinguished *Nantahala* because that case concerned an agreement allocating low-cost power, and the prudence of purchasing the available low-cost hydroelectric power was never at issue.

The state court adopted the view that in determining whether a particular aspect of state regulation was preempted by FERC action, the state court should "'examine those matters *actually determined*, whether expressly or impliedly, by the FERC.'" 506 So. 2d, at 986 (quoting *Appeal of Sinclair Machine Products, Inc.*, 126 N. H. 822, 833, 498 A. 2d 696, 704 (1985)). It concluded that "'[a]s to those matters not resolved by the FERC, State regulation is *not preempted provided* that regulation would not contradict or undermine FERC determinations and federal interests, or impose inconsistent obligations on the utility companies involved.'" 506 So. 2d, at 986. The court then noted that FERC "was never presented with the question of whether the completion of Grand Gulf, or its continued operation, was prudent" *ibid.*, and that the Court of Appeals in affirming FERC's allocation had "made no finding with regard to prudency *because the issue was not presented.*" *Id.*, at 987 (emphasis in original). Consistent with this analysis, the Mississippi Supreme Court remanded the case to the MPSC "for a review of the prudency of the Grand Gulf investment." The court specified that this review should "determine whether MP&L, [MSE] and MSU acted reasonably when they constructed Grand Gulf 1, in light of the change in demand for electric power in this state and the sudden escalation of costs." *Ibid.* Thus the MPSC was directed to examine the prudence of the investment of both domestic and foreign corporations in Grand Gulf *"in light of local conditions." Ibid.* (emphasis in original).

Appellant MP&L contends that our decision in *Nantahala*, the FPA, and the Commerce Clause require the MPSC in

setting retail electric rates to recognize that expenses incurred under FERC wholesale rate decisions that allocate interstate wholesale costs are reasonably incurred operating expenses.[10] In essence appellant asserts that FERC's allocation of Grand Gulf power pre-empts the jurisdiction of state regulatory agencies to set retail rates that do not recognize the costs associated with that allocation as reasonable. Appellees contend that the Supremacy Clause does not preclude review of MP&L's managerial prudence and that the effect of pre-emption would be to create a regulatory gap not contemplated by Congress, the Constitution, or this Court.

## II

We hold that our decision in *Nantahala* rests on a foundation that is broad enough to support the order entered by

---

[10] Appellant asserted in its jurisdictional statement that the Mississippi Supreme Court had rejected its challenge to the constitutionality of Miss. Code Ann. § 77–3–39 (Supp. 1987) and that this Court had appellate jurisdiction under 28 U. S. C. § 1257(2). Relying on this assertion and on the substantial federal question presented, we postponed further consideration of the question of jurisdiction to the hearing of the case on the merits. 484 U. S. 813 (1987). On further review of the decision of the Mississippi Supreme Court and of the briefs submitted by appellant to that court, however, we are of the view that appellant never challenged the constitutionality of § 77–3–39; rather it merely argued that the MPSC's exercise of jurisdiction to determine prudence would violate the Supremacy Clause. Although appellant's argument implicitly called into question the scope of any state statutes that speak to the MPSC's jurisdiction, it was not the type of express challenge to the constitutionality of the state statute required for this Court's exercise of jurisdiction under § 1257(2). See *Peralta* v. *Heights Medical Center, Inc.*, 485 U. S. 80, 84, n. 4 (1988). Consequently, we dismiss the appeal for want of jurisdiction. However, because the papers do present a substantial federal question, "construing the papers filed as a petition for a writ of certiorari, we now grant the petition." *Addington* v. *Texas*, 441 U. S. 418, 422–423 (1979); see 28 U. S. C. § 2103. As we have in previous cases in which we have construed a jurisdictional statement as a petition for certiorari, for convenience we continue to refer to the parties as appellant and appellees. See *Peralta*, 485 U. S., at 84, n. 4; *Kulko* v. *California Superior Court*, 436 U. S. 84, 90, n. 4 (1978).

FERC in this case and to require the MPSC to treat MP&L's FERC-mandated payments for Grand Gulf costs as reasonably incurred operating expenses for the purpose of setting MP&L's retail rates. The Mississippi Supreme Court's judgment ordering the MPSC to conduct proceedings to determine whether some or all of the costs were not prudently incurred is pre-empted by federal law and must be reversed.[11]

In *Nantahala* we considered the pre-emptive effect of a FERC order that reallocated the respective shares of two affiliated companies' entitlement to low-cost power. Under an agreement between the two affiliated companies, Nantahala, a public utility selling to both retail and wholesale customers in North Carolina, had been allocated 20% of the low-cost power purchased from the Tennessee Valley Authority (TVA), while 80% was reserved for the affiliate whose only customer was their common parent. FERC found that the agreement was unfair to Nantahala and ordered it to file a new wholesale rate schedule based on an entitlement to 22.5% of the low-cost power purchased from TVA. Subsequently, in a retail rate proceeding, the North Carolina Regulatory Commission reexamined the issue and determined that any share less than 24.5% was unfair and therefore ordered Nantahala to calculate its costs for retail ratemaking purposes as though it had received 24.5% of the low-cost power. The effect of the State Commission's order was to force Nantahala to calculate its retail rates as though FERC had allocated it a greater share of the low-cost power and to deny Nantahala the right to recover a portion of the costs it had incurred in paying rates that FERC had determined to

---

[11] Appellees contend that the judgment of the Mississippi Supreme Court is not "final" within the meaning of 28 U. S. C. § 1257 because further proceedings will be held on remand. The critical federal question—whether federal law pre-empts such proceedings while the FERC order remains in effect—has, however, already been answered by the State Supreme Court and its judgment is therefore ripe for review. See *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 477 (1975). See also R. Stern, E. Gressman, & S. Shapiro, Supreme Court Practice 129 (6th ed., 1986).

be just and reasonable. Although the North Carolina Supreme Court acknowledged FERC's exclusive jurisdiction over wholesale rates, it held that the State Commission's *de facto* reallocation of low-cost power was "'well within the field of exclusive state rate making authority engendered by the "bright line" between state and federal regulatory jurisdiction under the Federal Power Act.'" *Nantahala*, 476 U. S., at 961 (quoting *State ex rel. Utilities Comm'n v. Nantahala Power & Light Co.*, 313 N. C. 614, 687–688, 332 S. E. 2d 397, 440–441 (1985)). The state court emphasized that its order did not require Nantahala to violate the FERC order and that it was not expressly contradicting a FERC finding. We rejected these arguments. The reasoning that led to our decision in *Nantahala* applies with equal force here and compels the same conclusion—States may not alter FERC-ordered allocations of power by substituting their own determinations of what would be just and fair. FERC-mandated allocations of power are binding on the States, and States must treat those allocations as fair and reasonable when determining retail rates.

Our decision in *Nantahala* relied on fundamental principles concerning the pre-emptive impact of federal jurisdiction over wholesale rates on state regulation. First, FERC has exclusive authority to determine the reasonableness of wholesale rates. It is now settled that "'the right to a reasonable rate is the right to the rate which the Commission files or fixes, and, . . . except for review of the Commission's orders, [a] court can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one.'" *Nantahala*, 476 U. S., at 963–964 (quoting *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U. S. 246, 251–252 (1951)). This principle binds both state and federal courts and is in the former respect mandated by the Supremacy Clause. 476 U. S., at 963. Second, FERC's exclusive jurisdiction applies not only to rates but also to power allocations that affect wholesale rates. *Id.*, at 966.

Third, States may not bar regulated utilities from passing through to retail consumers FERC-mandated wholesale rates. "The filed rate doctrine ensures that sellers of wholesale power governed by FERC can recover the costs incurred by their payment of just and reasonable FERC-set rates. When FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate. . . . Such a 'trapping' of costs is prohibited." *Id.*, at 970. These principles led us to hold in *Nantahala* that the North Carolina Utilities Commission's order "trapping" federally mandated costs was pre-empted. Today they compel us to hold that the MPSC may not enter an order "trapping" the costs MP&L is mandated to pay under the FERC order allocating Grand Gulf power or undertake a "prudence" review for the purpose of deciding whether to enter such an order.[12]

The facts of this case and *Nantahala* are not distinguishable in any way that has relevance to the operation of the principles stated above. Both cases concern FERC orders adjusting in the interest of fairness voluntary allocations of power among related entities. *Nantahala* involved a FERC order fixing the utility's right to acquire low-cost power; this case involves a FERC order fixing MP&L's obligation to acquire high-cost power. In *Nantahala* FERC had "deter-

---

[12] It is clear that the only purpose of the prudence review ordered by the Mississippi Supreme Court was to determine whether the costs FERC had directed MP&L to pay for its allocation of Grand Gulf power should be "trapped" or passed on to MP&L's retail customers. The Mississippi Supreme Court's judgment ordering the review itself had the effect of "trapping" some Grand Gulf costs since the MPSC responded to the judgment by rescinding the previously approved rate increase and ordering MP&L to submit a plan for refunding to its customers all of its prior recovery of Grand Gulf expenses. To prevent this "trapping," we granted a stay of the Mississippi Supreme Court's judgment. *Mississippi Power & Light Co.* v. *Mississippi ex rel. Pittman*, 483 U. S. 1013 (1987).

mined that Nantahala's average cost of power obtained from TVA should be based on a particular allocation of entitlements power, *and no other*," *id.*, at 971 (emphasis added); in this case FERC has determined that MP&L's cost of power obtained from Grand Gulf should be based on a particular allocation, and no other. In *Nantahala* the state court attempted to approve retail rates based on the assumption that Nantahala was entitled to more low-cost power than FERC had allocated to it. Here the state court seeks to permit the State to set rates based on an assumption that MP&L is obligated to purchase less Grand Gulf power than FERC has ordered it to purchase.

In this case as in *Nantahala* we hold that "a state utility commission setting retail prices must allow, as reasonable operating expenses, costs incurred as a result of paying a FERC-determined wholesale price. . . . Once FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority." *Nantahala*, 476 U. S., at 965, 966. Thus we conclude that the Supremacy Clause compels the MPSC to permit MP&L to recover as a reasonable operating expense costs incurred as the result of paying a FERC-determined wholesale rate for a FERC-mandated allocation of power.

Appellees seek to characterize this case as falling within facts distinguished in *Nantahala*. Without purporting to determine the issue, we stated in *Nantahala:* "[W]e may assume that a particular *quantity* of power procured by a utility from a particular source could be deemed unreasonably excessive if lower-cost power is available elsewhere, even though the higher-cost power actually purchased is obtained at a FERC-approved, and therefore reasonable, *price*." *Id.*, at 972 (emphasis in original). As we assumed, it might well be unreasonable for a utility to purchase unnecessary quanti-

ties of high-cost power, even at FERC-approved rates, if it had the legal right to refuse to buy that power. But if the integrity of FERC regulation is to be preserved, it obviously cannot be unreasonable for MP&L to procure the particular quantity of high-priced Grand Gulf power that FERC has ordered it to pay for. Just as Nantahala had no legal right to obtain any more low-cost TVA power than the amount allocated by FERC, it is equally clear that MP&L may not pay for less Grand Gulf power than the amount allocated by FERC.

The Mississippi Supreme Court erred in adopting the view that the pre-emptive effect of FERC jurisdiction turned on whether a particular matter was actually determined in the FERC proceedings. See 506 So. 2d, at 986. We have long rejected this sort of "'case-by-case analysis of the impact of state regulation upon the national interest'" in power regulation cases. *Nantahala*, 476 U. S., at 966 (quoting *FPC v. Southern California Edison Co.*, 376 U. S. 205, 215–216 (1964)). Congress has drawn a bright line between state and federal authority in the setting of wholesale rates and in the regulation of agreements that affect wholesale rates. States may not regulate in areas where FERC has properly exercised its jurisdiction to determine just and reasonable wholesale rates or to insure that agreements affecting wholesale rates are reasonable. FERC's jurisdiction to adjust the allocations of Grand Gulf power in the UPSA has been established.[13] Mississippi, therefore, may not consistent with the Supremacy Clause conduct any proceedings that challenge the reasonableness of FERC's allocation.

---

[13] Appellant and other parties unsuccessfully challenged the jurisdiction of FERC over the UPSA in the FERC proceedings and on appeal to the United States Court of Appeals for the District of Columbia Circuit. After thorough consideration at every level of administrative and judicial review, this challenge was rejected. See 26 FERC, at 65,113–65,117; 31 FERC, at 61,643–61,644; 32 FERC, at 61,943–61,951; 257 U. S. App. D. C., at 258–262, 808 F. 2d, 1539–1543.

The reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts. The only appropriate forum for such a challenge is before the Commission or a court reviewing the Commission's order. The Mississippi Supreme Court attached considerable significance to the fact that the prudence of investing in Grand Gulf and bringing it on line was not discussed either in the proceedings before FERC or on review by the United States Court of Appeals for the District of Columbia Circuit. The question of prudence was not discussed, however, because no party raised the issue, not because it was a matter beyond the scope of FERC's jurisdiction. The Mississippi Supreme Court characterized the conduct of MP&L and its sister companies as an effort to "us[e] the jurisdictional relationship between state and federal regulatory agencies to completely evade a prudency review of Grand Gulf costs by either agency." 506 So. 2d, at 979. The facts of this case, however, offer no evidence of such subterfuge. The very parties who are appellees here and who urged the Mississippi Supreme Court to order the MPSC to conduct a prudence review were also participants in the proceedings before FERC. The parties to the FERC proceedings recognized the impact that FERC's order would have on the jurisdiction of the state regulatory agencies. See *Middle South Energy, Inc.*, 32 FERC, at 61,951–61,952. Despite that recognition, appellees failed to raise the matter of the prudence of the investment in Grand Gulf before FERC though it was a matter FERC easily could have considered in determining whether to permit MSE to recoup 100% of the costs of Grand Gulf in the wholesale rates it charged to the four operating companies and in allocating Grand Gulf power. See *New England Power Co.*, 31 FERC ¶ 61,047, pp. 61,081–61,084 (1985), enf'd, 800 F. 2d 280 (CA1 1986).

In fact, FERC did consider and reject some aspects of the prudence review the Mississippi Supreme Court directed the MPSC to conduct. The state court emphasized that the MPSC was to determine whether "MSU and its subsidiaries made reasonable decisions *in light of local conditions.*" 506 So. 2d, at 987. FERC rejected, however, the argument that decisions about the allocation of Grand Gulf costs should be made in light of the needs of any one of the operating companies. It emphasized that "the Middle South companies appropriately approach power planning on a systemwide basis, whereby the individual companies' needs are the component parts of the System power plan [and that] [i]mplementation of the System plan . . . require[d] that the individual companies' needs be subsumed by the greater interests of the entire System." 32 FERC, at 61,958. Thus FERC's order specifically bars a state regulatory agency from evaluating the prudence of Grand Gulf "in light of local conditions" alone. The state court also directed a "complete review of the transactions between MP&L, [MSE], and MSU, and their effect on Grand Gulf expense." These transactions, however, comprise the very System Agreements between MSU and the operating companies and UPSA evaluated by FERC in the exercise of its jurisdiction over wholesale rates. The MPSC lacks jurisdiction to reevaluate the reasonableness of those transactions. The MPSC cannot evaluate either the prudence of MSU's decision to invest in Grand Gulf and bring it on line or the prudence of MP&L's decision to be a party to agreements to construct and operate Grand Gulf without traversing matters squarely within FERC's jurisdiction.[14]

---

[14] In addition to arguing that the Supremacy Clause does not bar an MPSC prudence inquiry, appellees argue that MP&L should be equitably estopped from arguing that the prudence review ordered by the Mississippi Supreme Court is pre-empted by federal law. In acquiring a license from the State of Mississippi to construct Grand Gulf, MSU and MP&L made certain representations to the MPSC as to how Grand Gulf costs and power would be allocated. Appellees do not claim that these representations were false when made, Brief for Appellee State of Mississippi 39, or

There "can be no divided authority over interstate commerce . . . the acts of Congress on that subject are supreme and exclusive." *Missouri Pacific R. Co.* v. *Stroud*, 267 U. S. 404, 408 (1925). Consequently, a state agency's "efforts to regulate commerce must fall when they conflict with or interfere with federal authority over the same activity." *Chicago & North Western Transp. Co.* v. *Kalo Brick & Tile Co.*, 450 U. S. 311, 318–319 (1981). Mississippi's effort to invade the province of federal authority must be rejected. The judgment of the Mississippi Supreme Court is reversed.

*It is so ordered.*

JUSTICE SCALIA, concurring in the judgment.

I concur in the judgment of the Court, but write separately to discuss more fully what is to me the critical issue in this case: whether FERC had jurisdiction to determine whether MP&L's agreement to participate in the construction of Grand Gulf 1 and to purchase power from that facility was prudent.

It is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject. See *Nantahala Power & Light Co.* v. *Thornburg*, 476 U. S. 953, 962–967 (1986). FERC has determined that when two or more utilities form a joint venture or pool to share electrical generating capacity, including construction of

that FERC was bound by the representations made in the state proceedings, *id.*, at 42; rather, they argue that MSU should have been "denied standing . . . to file an application with FERC, or enforce any allocation against the Mississippi service area other than originally represented to secure the necessary construction certificate," *id.*, at 43. This argument has no relevance to the pre-emption question before us. Representations in state proceedings, even ones that were false when made, cannot subvert the operation of the Supremacy Clause. The appropriate place to contend that MSU and or MP&L lacked standing before the FERC was in the Commission proceedings, and the argument was in fact raised and rejected in those proceedings. See 257 U. S. App. D. C., at 268–269, 808 F. 2d, at 1549–1550.

a new facility, the resulting transfers of power are wholesales of electricity subject to FERC's jurisdiction under the Federal Power Act, 16 U. S. C. § 791a *et seq.* It is not disputed that in reviewing the wholesale rates charged to the participants in such a venture, FERC has jurisdiction to determine whether the venture was prudent as a whole. Nor is it seriously contested that in general FERC has jurisdiction to determine a fair allocation of the cost of the facility among the utilities in the pool. Cf. *Nantahala, supra,* at 966. The central controverted issue in the present case is whether FERC has jurisdiction to determine the prudence *of a particular utility's participation* in the pool.

FERC has asserted that it has such jurisdiction in the context of a pool of affiliated companies. In *AEP Generating Co.,* 36 FERC ¶ 61,226 (1986), FERC was asked to consider the prudence, "in light of the availability of alternative power supplies," of Kentucky Power Company's agreement to purchase 15% of the capacity of a generating facility as part of a pooling agreement with other, affiliated, utilities. *Id.,* at 61,549. FERC agreed to do so, concluding that fair allocation of costs among the utilities was inseparable from some inquiry into the prudence of Kentucky Power's entering into the pooling arrangement in light of available alternative power supplies. *Id.,* at 61,550–61,551. FERC explained that "the transaction involves affiliated, jurisdictional utilities, which are members of an integrated, interstate holding company arrangement" and that "[u]nder these circumstances, more complex, interrelated questions arise and, whether one characterizes the questions as related to prudence, interpretation [of the basic system agreements], or cost allocation, they are clearly matters most appropriately resolved by the Commission as part of its overriding authority to evaluate and implement all applicable wholesale rate schedules." *Id.,* at 61,550.

*AEP Generating Co.* makes plain that for the type of arrangement at issue in this case, see *ante,* at 357, and n. 1—a

joint venture or pooling agreement among affiliated companies—FERC asserts jurisdiction to inquire into the prudence of a particular utility's entering the arrangement. Nothing the Commission said or did in the present case is inconsistent with that assertion of jurisdiction. Its statement that allocation of the costs of Grand Gulf was not to be based on the "needs" of particular utilities, *Middle South Energy, Inc.*, 32 FERC ¶ 61,425, p. 61,958 (1985), merely rejects allocating costs according to the *current* needs of the utilities, which would be incompatible with the utilities' agreement to approach power planning on a systemwide basis. That has nothing to do with whether the prudence of a utility's joining the system in the first place can be examined. It is true, of course, that FERC did not conduct such an examination in the present case; but, as the Court discusses, see *ante*, at 375, neither did any party ask it to do so. That failure to ask does not take the issue out of FERC's jurisdiction and recommit it to the States.*

---

*The dissent's assertion that "[i]n conducting this litigation, FERC originally took the position that it had no jurisdiction over the prudence of a pool member's purchase decision," *post*, at 388, is contradicted by the passage cited by the dissent from the Administrative Law Judge (ALJ) hearings. To be sure, appellees asserted before the ALJ that FERC had no jurisdiction over this prudency issue, see App. to Motion to Dismiss 52–53, 54, 56, 60, 61, 62, but the ALJ gave clear indications that he would address such an issue if a party pressed it:

"MR. EASTLAND [for MPSC]: . . . [W]hat we say we can do is that you set a wholesale charge, . . . but it is not necessarily proper or prudent for that utility, for purposes of utilizing that power in retail sales, to buy that power.

"That's what we're saying that we have the jurisdiction to make decisions with respect to.

"PRESIDING JUDGE: . . . I would not get into a prudency argument unless one of the Intervenors raises a prudency question.

"I mean we have prudency questions in the gas cases now all over the place, with customers screaming that the purchasing practices of the pipelines were imprudent, and those prudency issues have been set for hearing in rate cases as an initial determination as to the justness and reasonable-

What the case comes down to, then, is whether FERC's asserted jurisdiction to examine the prudence of a particular utility's joining a pooling arrangement with affiliated companies is supported by the provisions of the Federal Power Act. If so, there is no regulatory gap for the States to fill, and they are pre-empted from examining that question of prudence in calculating the rates chargeable to retail customers. In considering the Federal Power Act question we will defer, of course, to FERC's construction if it does not violate plain meaning and is a reasonable interpretation of silence or ambiguity. See, *e. g., K mart Corp.* v. *Cartier, Inc.,* 486 U. S. 281, 291–292 (1988); *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–844 (1984).

Contrary to the dissent, *post,* at 386–387, we have held that this rule of deference applies to an agency's interpretation of a statute designed to confine its authority. See, *e. g., Japan Whaling Assn.* v. *American Cetacean Society,* 478 U. S. 221, 226, 233 (1986); *Chemical Manufacturers Assn.* v.

---

ness of the rates and rate design, and what you should do if there is imprudence. So it comes into the justness and reasonableness.

"But if you are not going to argue that—If the Intervenors themselves are not going to argue imprudence on behalf of the company, MSE or the operating companies, I'm not going to get into that issue.

"MR. VINCE [for Council of the City of New Orleans (not a party here)]: Would your Honor be examining the issue of prudency in the subject of allocation?

"PRESIDING JUDGE: Not unless you raise it.

"MR. VINCE: Your Honor, New Orleans . . . would perhaps propose to take this one step further and say that the allocation, first of all with reference to AP&L, was imprudent and secondly, with reference to the individual operating companies was imprudent, and the methodology for the allocation was imprudent.

"PRESIDING JUDGE: Okay. If you raise that question then I will have to decide the prudency issue in the context of deciding whether or not such alleged imprudency would justify a finding of unjust unreasonableness in the allocation or discrimination with respect to the allocation.

"So you are raising the prudency issue?

"MR. VINCE: With respect to allocation, yes.

"PRESIDING JUDGE: Okay. So it's in." *Id.,* at 60–62.

*Natural Resources Defense Council, Inc.*, 470 U. S. 116, 123, 125, 126 (1985). In particular, it is settled law that the rule of deference applies even to an agency's interpretation of its own statutory authority or jurisdiction. See *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 844–845, (1986); *NLRB* v. *City Disposal Systems, Inc.*, 465 U. S. 822, 830, n. 7 (1984) ("We have never . . . held that such an exception [for issues of statutory jurisdiction] exists to the normal standard of review . . . ; indeed, we have not hesitated to defer . . ."); see also, *e. g., City of New York* v. *FCC*, 486 U. S. 57, 64 (1988); *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S. 691, 700 (1984); *CBS, Inc.* v. *FCC*, 453 U. S. 367, 382 (1981); *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 379–381 (1969); *FTC* v. *Bunte Brothers, Inc.*, 312 U. S. 349, 352 (1941) (dictum). In fact, the arguments relied on by the dissent, *post*, at 386–387, have been expressly rejected by this Court—namely, that agencies can claim no special expertise in interpreting their authorizing statutes if an issue can be characterized as jurisdictional, see *Schor, supra*, at 845, and that the usual reliance on the agency to resolve conflicting policies is inappropriate if the resolution involves defining the limits of the agency's authority, see, *e. g., City of New York* v. *FCC, supra*, at 64, rather than (what is really no different) defining the limits of application of authority it plainly has. Rather, it is plain that giving deference to an administrative interpretation of its statutory jurisdiction or authority is both necessary and appropriate. It is *necessary* because there is no discernible line between an agency's exceeding its authority and an agency's exceeding authorized application of its authority. To exceed authorized application is to exceed authority. Virtually any administrative action can be characterized as either the one or the other, depending upon how generally one wishes to describe the "authority." Cf. *NLRB* v. *City Disposal Systems, Inc., supra*, at 830, n. 7. And deference is *appropriate* because it is consistent with the general rationale for deference: Congress would naturally ex-

pect that the agency would be responsible, within broad limits, for resolving ambiguities in its statutory authority or jurisdiction. Cf. *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, *supra*, at 843–844. Congress would neither anticipate nor desire that every ambiguity in statutory authority would be addressed, *de novo*, by the courts. To be sure, in defining agency jurisdiction Congress sometimes speaks in plain terms, in which case the agency has no discretion. But the dissent concedes that in this case, "[i]f agency deference applied, . . . these prudency issues are sufficiently intertwined that we should defer to FERC's conclusion." *Post*, at 386.

FERC's interpretation in the present case satisfies the conditions for deference. Under 16 U. S. C. § 824e(a), FERC is responsible for assuring that the rates charged to purchasers of electric energy at wholesale, and the contracts affecting such rates, are not "unjust, unreasonable, unduly discriminatory or preferential." Perhaps (we need not decide the point today) it cannot be considered "unjust, unreasonable, unduly discriminatory or preferential" to hold the participant in a joint venture to that fair proportion of the costs which it contracted in arm's-length negotiations to bear, even though its entry into the contract may have been imprudent. But I think it assuredly can be considered "unjust, unreasonable, unduly discriminatory or preferential" (for purposes of the ends served by the Federal Power Act) to make a participant bear such costs under an imprudent contract it was essentially assigned, through a process in which the overall interests of the affiliated group rather than the particular interest of the individual affiliate was paramount. It is entirely reasonable to think that the fairness of rates and contracts relating to joint ventures among affiliated companies cannot be separated from an inquiry into the prudence of each affiliate's participation.

Appellees rely upon the language in § 824(b)(1) which states that FERC "shall not have jurisdiction, except as spe-

cifically provided in this subchapter [the Federal Power Act] . . . , over facilities used for the generation of electric energy." But this does not plainly contradict FERC's assertion of jurisdiction. First, it is reasonable to regard FERC's § 824e(a) authority to set wholesale rates as precisely an example of jurisdiction "specifically provided." And second, it is reasonable to say that FERC is not exercising jurisdiction over the electrical generating facility but merely over the sale of the power created by that facility.

After today, the battle will no longer be over who has jurisdiction, FERC or the States, to evaluate the prudence of a particular utility's entering pooling arrangements with affiliated companies for the sharing of electrical generating capacity or the creation and wholesaling of electrical energy. FERC has asserted that jurisdiction and has been vindicated. What goes along with the jurisdiction is the responsibility, where the issue is appropriately raised, to protect against allocations that have the effect of making the ratepayers of one State subsidize those of another.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

This case involves two separate prudency issues: one is governed by *Nantahala Power & Light Co.* v. *Thornburg*, 476 U. S. 953 (1986); the other is not. The first issue is whether the state utility commission has jurisdiction to determine whether, treating appellant's participation in the Grand Gulf project as a given, it was imprudent for appellant to purchase such a high amount of expensive Grand Gulf power. I agree with the Court that the portions of the Mississippi Supreme Court's opinion suggesting that the state commission does have this jurisdiction are in error. *Mississippi ex rel. Pittman* v. *Mississippi Public Service Comm'n*, 506 So. 2d 978, 984–985 (1987). The State cannot second-guess the prudency of the amount of power purchased because FERC's order imposed this allocation of power on appellant. The issue is precisely analogous to that decided in

*Nantahala,* where a state utility commission setting retail rates refused to allow a utility to recover its full wholesale costs on the theory that the utility should have purchased more low-cost power than it was allocated under a FERC order. Just as in *Nantahala* the utility's purchases of high-cost power could not be deemed unreasonably large because the utility could not have purchased any more low-cost power than FERC had allocated it, 476 U. S., at 972–973, so here, given that appellant had entered into and completed the Grand Gulf project, appellant's purchases of high-cost power could not be deemed unreasonably large because it could not have purchased any less high-cost power than FERC's allocation order compelled it to purchase.

That issue is distinct, however, from the issue whether, to the extent appellant's decision to participate in the Grand Gulf project involved the purchase decision of a retail utility, a state utility commission has jurisdiction to review the prudency of that purchase. This issue cannot be resolved by simple reference to *Nantahala,* for FERC did not order appellant to participate in the Grand Gulf project, and although FERC's order determines the allocation of the costs incurred in the project, the question remains whether appellant imprudently incurred those costs in the first place. I am convinced that the state utility commission does have jurisdiction over this prudency issue, and thus I would affirm the Mississippi Supreme Court's judgment remanding for a prudency determination. The question is, however, a complicated one, which forces us to confront the issue of how the normal jurisdictional principles of the Federal Power Act apply to the rather special situation of an interstate electricity pool.

In direct response to decisions of this Court concluding that, under the Commerce Clause, States can regulate interstate sales of energy at retail but not at wholesale, Congress enacted the Federal Power Act, which filled the regulatory gap and incorporated the wholesale/retail line by providing

FERC with regulatory jurisdiction over wholesale interstate sales of electricity and leaving retail sales to state regulation. See 16 U. S. C. §§ 824(a) and (b)(1); *Arkansas Electric Cooperative Corp.* v. *Arkansas Public Service Comm'n*, 461 U. S. 375, 377–380 (1983). Where retailing and wholesaling utilities are independent, the impact of this wholesale/retail division on federal and state jurisdiction to conduct prudency review is clear and undisputed. FERC has jurisdiction to determine whether a wholesaling utility has incurred costs imprudently. See, *e. g., Arizona Public Service Co.,* 27 FERC ¶ 61,185 (1984). If FERC determines that costs were prudently incurred, it allows the wholesale rates to reflect those costs; otherwise, the wholesale rates cannot reflect those costs, and the wholesaler's stockholders, rather than its customers, must bear the burden of the utility's imprudence. See, *e. g., Violet* v. *FERC*, 800 F. 2d 280 (CA1 1986). FERC does not, however, have jurisdiction to determine whether it might be imprudent, given other purchasing options, for a retailing utility to *purchase* power at the FERC-approved wholesale rate. See, *e. g., Southern Company Services, Inc.,* 28 FERC ¶ 61,349 (1984). The state utility commissions have jurisdiction to determine, for example, that the retail utility does not need the power or could obtain power from other sources at a lower cost. *Nantahala, supra,* at 972. Thus, although a state utility commission cannot decide that a retail utility should have bought wholesale power from a given source at other than the FERC-approved wholesale rate, it can decide that the utility should not have bought power from that source at all. See, *e. g., Pike County Light & Power Co.* v. *Pennsylvania Public Utility Comm'n,* 77 Pa. Commw. 268, 273–274, 465 A. 2d 735, 737–738 (1983). In short, the reasonableness of charging a rate as a wholesaler is distinct from the reasonableness of incurring that charge as a purchaser. See, *e. g., Appeal of Sinclair Machine Products, Inc.,* 126 N. H. 822, 498 A. 2d 696 (1985).

Interstate electricity pools, however, present special difficulties for the wholesale/retail division of jurisdiction because the "wholesale" transaction is from the pool to the utilities belonging to the pool, and thus the entities wholesaling the power are the same ones purchasing and retailing that power. As a result, a member utility's decision to participate in the pool's building or operation of a powerplant is simultaneously a decision to purchase the power generated by that plant. The purchasing aspects of such a decision would seem to be within the jurisdiction of state utility commissions to determine whether a retail utility's decision to purchase power is prudent under state-law standards before those purchase costs can be passed on to retail customers. On the other hand, FERC would seem to have jurisdiction to determine the prudency of incurring these building or operation costs in order to determine whether those costs can be reflected in the wholesale rates the pool charges the member utilities.

If agency deference applied, I would conclude that these prudency issues are sufficiently intertwined that we should defer to FERC's conclusion that it has exclusive jurisdiction to determine all prudency issues concerning the participation of a retail utility in an interstate pool. I cannot, however, agree with JUSTICE SCALIA's conclusion that courts must defer to an agency's statutory construction even where, as here, the statute is designed to confine the scope of the agency's jurisdiction to the areas Congress intended it to occupy. *Ante*, at 380–382. Our agency deference cases have always been limited to statutes the agency was "entrusted to administer." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844 (1984); see also *id.*, at 842; *Japan Whaling Assn.* v. *American Cetacean Society*, 478 U. S. 221, 233 (1986); *Chemical Manufacturers Assn.* v. *Natural Resources Defense Council, Inc.*, 470 U. S. 116, 125 (1985). Agencies do not "administer" statutes confining the scope of their jurisdiction, and such statutes are not "en-

trusted" to agencies. Nor do the normal reasons for agency deference apply. First, statutes confining an agency's jurisdiction do not reflect conflicts between policies that have been committed to the agency's care, cf. *City of New York* v. *FCC*, 486 U. S. 57, 65 (1988); *Chevron, supra,* at 843–845; *Capital Cities Cable, Inc.* v. *Crisp,* 467 U. S. 691, 700 (1984), but rather reflect policies in favor of limiting the agency's jurisdiction that, by definition, have not been entrusted to the agency and that may indeed conflict not only with the statutory policies the agency *has* been charged with advancing but also with the agency's institutional interests in expanding its own power. Second, for similar reasons, agencies can claim no special expertise in interpreting a statute confining its jurisdiction. Finally, we cannot presume that Congress implicitly intended an agency to fill "gaps" in a statute confining the agency's jurisdiction, *Chevron, supra,* at 843–844, since by its nature such a statute manifests an unwillingness to give the agency the freedom to define the scope of its own power. Cf. *Commodity Futures Trading Comm'n* v. *Schor,* 478 U. S. 833, 841–847 (1986) (citing statutory language and legislative history demonstrating that the agency was delegated broad authority to determine which counterclaims to adjudicate); *NLRB* v. *City Disposal Systems, Inc.,* 465 U. S. 822, 829 (1984) (deferring to agency interpretation of statute defining the scope of employees' right to engage in concerted activities under the National Labor Relations Act). It is thus not surprising that this Court has never deferred to an agency's interpretation of a statute designed to confine the scope of its jurisdiction.

In this case, it could not be plainer that the statutes at issue were designed to confine the scope of FERC's jurisdiction by prohibiting FERC from regulating matters within the sphere of authority States had to regulate retail utilities under our old Commerce Clause cases. See *supra,* at 384–385. The Act provides that "Federal Regulation [is] to extend only to those matters which are not subject to regula-

tion by the States," 16 U. S. C. § 824(a), and that "[t]he provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but [with an exception not relevant here] shall not apply to any other sale of electric energy," 16 U. S. C. § 824(b)(1). The intent evident from the face of the statute is only reinforced by the legislative history, which, as we have noted before, shows a "constant purpose to protect . . . [the] authority of the states." *Connecticut Light & Power Co.* v. *FPC*, 324 U. S. 515, 525–527 (1945). See also S. Rep. No. 621, 74th Cong., 1st Sess., 48 (1935) ("[T]he policy of Congress [is] . . . not to impair or diminish the powers of any State commission"); H. R. Rep. No. 1318, 74th Cong., 1st Sess., 7, 8, 27 (1935) ("The bill takes no authority from State commissions"). Deference is particularly inappropriate where, as here, the statute is designed not merely to confine an agency's jurisdiction but to preserve the jurisdiction of other regulators, for Congress could not have intended courts to defer to one agency's interpretation of the jurisdictional division where the policies in conflict have purposely been committed to the care of different regulators.

Furthermore, FERC's statutory construction in this area has not been consistent and was not contemporaneous with the enactment of the Federal Power Act. See generally *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 446–447, n. 30 (1987); *Schor, supra,* at 844–845. In conducting this litigation, FERC originally took the position that it had no jurisdiction over the prudence of a pool member's purchase decision and over whether the costs could be passed on to retail customers. App. to Motion to Dismiss 52–66.* Since then

---

*Although JUSTICE SCALIA cites language from the Administrative Law Judge (ALJ) hearing demonstrating that the ALJ indicated his willingness to address certain "prudency issues," *ante* at 379, n., the ALJ stressed throughout the hearing the distinction between prudency issues relevant to setting wholesale rates and issues regarding the prudency of power pur-

FERC has, as JUSTICE SCALIA notes, *ante*, at 378–379, issued an opinion concluding that in regulating an integrated interstate pool, FERC's determination regarding the prudence of a wholesaler's costs inevitably determines the prudence of the wholesale purchase and the decision to enter into a pooling agreement. But FERC specifically noted in that opinion that its present conclusion differs from the position it took earlier in that very litigation. *AEP Generating Co.*, 36 FERC ¶ 61,226, p. 61,550 (1986).

I thus examine the jurisdictional issue without any special deference to the agency's position. I note at the outset that FERC's position rests on an already shaky jurisdictional foundation. FERC does not, after all, have any jurisdiction over a utility that simply builds its own generating facility and retails the electricity. FERC nonetheless asserts jurisdiction over transactions between a pool's generating facility and the utilities belonging to the pool on the theory that the pool and the member utilities are sufficiently separate to deem the transaction a wholesale transaction rather than an internal transfer. In some tension with this position, it then asserts jurisdiction to allocate power in a way that forces purchases from the pool on the theory that the member utilities are sufficiently integrated in the pool so that it is merely allocating costs rather than forcing purchases on retail utilities. The United States Court of Appeals for the District of Columbia Circuit upheld FERC's jurisdiction on both counts. *Mississippi Industries* v. *FERC*, 257 U. S. App. D. C. 244, 258–262, 264–266, 808 F. 2d 1525, 1539–1543, 1545–1547, cert. denied, 484 U. S. 985 (1987). Now FERC seeks to complete the jurisdictional circle by asserting that the state

---

chases and their effect on retail rates, and stated several times that he and FERC would and could only address the former. App. to Motion to Dismiss 61, 63, 66. At any rate, regardless of FERC's position in this case (and it was at best unclear), FERC has certainly not demonstrated a consistent agency interpretation, nor one that was contemporaneous with the enactment of the Federal Power Act.

utility commissions do not even have the authority to question whether retail utilities have made imprudent purchase decisions by deciding to participate in pool projects, even though those decisions are what leaves the retail utilities in the position to have part of the incurred costs allocated onto them by FERC via forced purchases.

The jurisdictional decisions of the United States Court of Appeals for the District of Columbia Circuit are not before us, and I do not question them. Indeed, it makes a great deal of sense to read the statute as allowing FERC to exercise jurisdiction over the allocation of costs among interstate pool members because otherwise every state commission would have a parochial incentive to claim that the costs must be imposed on the utilities located in other States. A neutral federal mediator is needed. The issue of allocation is logically distinct, however, from the issue whether the costs allocated to a particular utility should be borne by the retail customers, through increased rates, or by the utility's stockholders. The latter issue is the type over which States traditionally exercise jurisdiction, and there are no special reasons counseling for a neutral federal intermediary. Nor, given that FERC's asserted authority to force intrapool purchases by retail utilities already lies at the farthest reaches of its jurisdiction, is there any reason to read this allocative authority expansively to encompass matters within the traditional purview of the States.

To be sure, in regulating the wholesale rates of an integrated interstate pool and determining the prudence of the costs the pool incurred as the wholesaler, FERC will examine many of the same factors a state utility commission would examine in reviewing the prudence of the decision to purchase that is part of entering into and continuing a pool project. But the issues are not identical. For example, if one retail utility happens to have a low-cost source and enters into an agreement to build a medium-cost plant, the construction of the medium-cost plant may not involve any impru-

dently incurred costs from the wholesaling perspective, but the medium-cost purchase would be imprudent for the retail utility with the low-cost source. Even to the extent the prudency issues do overlap, I see no reason why FERC's review should bar States from applying state-law standards of prudency to the purchase decisions that are an integral part of a member retail utility's participation in an interstate pool. FERC's interpretation of the Act would divest States of authority to determine the prudence of costs incurred by retail utilities whenever those utilities belong to an interstate pool—a result that I do not think can be squared (particularly given FERC's shaky jurisdictional foundation) with the clear intent of Congress to preserve the authority of States to regulate retail utilities. See *supra*, at 387–388. Moreover, allowing only FERC review of interstate pool decisions would effectively allow retail utilities that either belong to interstate pools or span more than one State to pick and choose between state and federal regulation by deciding whether to form subsidiaries to operate their generating facilities and sell them "wholesale" electricity.

I thus conclude that regardless of FERC's jurisdiction to allocate incurred costs among member utilities and regardless of its jurisdiction to review the prudency of an interstate pool's projects in order to set wholesale rates for intrapool transactions, state utility commissions retain jurisdiction to determine whether incurring those costs involved prudent purchase decisions that can be passed on to retail customers. I thus dissent from the Court's decision to reverse the Mississippi Supreme Court's judgment remanding for a prudency determination.