880 F.2d 1400
 279 U.S.App.D.C. 327, Fed. Sec. L. Rep. P 94,528,
105 P.U.R.4th 530
 OHIO POWER COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
LCP Chemicals & Plastics, Inc., et al., Municipal Wholesale
Electric Customers of Ohio Power Company, Intervenors.
 No. 88-1293.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 24, 1989.
Decided July 28, 1989.
 
 Edward Berlin, with whom Andrew L. Lipps, Kenneth G. Jaffe, Washington, D.C., and Edward J. Brady, were on the brief, for petitioner.
 Joanne Leveque, Attorney, F.E.R.C., with whom Catherine C. Cook, Gen. Counsel, and Joseph S. Davies, Deputy Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent.
 John Estes also entered an appearance for respondent.
 Gregg D. Ottinger, Washington, D.C., and T.D. Kauffelt, Charleston, W. Va., were on the brief, for intervenors, Municipal Wholesale Electric Customer of Ohio Power Company and Industrial intervenors.
 Before MIKVA, SILBERMAN, and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 Concurring opinion filed by Circuit Judge MIKVA.
 SENTELLE, Circuit Judge:
 
 
 1
 The Federal Energy Regulatory Commission (FERC) determined in a rate proceeding that Ohio Power Company's cost of coal purchased from an associated company was unreasonably high. The company has petitioned us to vacate the order on the grounds that it is for the Securities and Exchange Commission (SEC) to determine the reasonableness of contracts between associated companies. We grant the petition for the reasons set out below.
 
 I. BACKGROUND
 A. The Statute
 
 2
 The central issue raised by petitioner concerns the applied meaning of the phrase "subject matter" in section 318 of the Federal Power Act (FPA), 16 U.S.C. Sec. 825q, an issue to which section 13(b) of the Public Utility Holding Company Act of 1935 (PUHCA), 15 U.S.C. Sec. 79m(b), is relevant. FPA Sec. 318 and PUHCA Sec. 13 were enacted in different titles of the Public Utility Act of 1935, ch. 687, 49 Stat. 803 (1935) (codified as amended principally at 15 U.S.C. Secs. 79 to 79z-6 and 16 U.S.C. Secs. 824-825r (1982 & Supp. V 1987)), which initiated federal regulation of public utility holding companies theretofore insulated from effective state-level regulation by their multi-state operations. The broadly remedial purposes of the Public Utility Act included protection of investors, consumers, and the public from various abusive holding company practices, including non-arm's-length contracts within an associated group. See 15 U.S.C. Sec. 79a(b)(2). (The definitions of public utility holding company, associate company, and similar terms are set out in section 2 of PUHCA, 15 U.S.C. Sec. 79b. Those definitions are applicable to the present case but not in dispute.)
 
 
 3
 More particularly for our purposes, PUHCA Sec. 13(b) makes unlawful contracts between associates of a public utility holding company,
 
 
 4
 except in accordance with such terms and conditions and subject to such limitations and prohibitions as the [SEC] ... shall prescribe as necessary or appropriate in the public interest or for the protection of investors or consumers and to insure that such contracts are performed economically and efficiently for the benefit of such associate companies at cost, fairly and equitably allocated among such companies.
 
 
 5
 15 U.S.C. Sec. 79m(b).[1] The SEC's Rule 90 prohibits associated companies from making or performing contracts for sale of goods or performance of services "at more than cost." 17 C.F.R. Sec. 250.90(a)(2) (1988). Under the SEC's Rule 91, a transaction is deemed to meet that standard when the price "does not exceed a fair and equitable allocation of expenses ... plus reasonable compensation for necessary capital procured through the issuance of capital stock...." 17 C.F.R. Sec. 250.91(a). The sale between associates of seller-produced goods is not "limited to cost," 17 C.F.R. Sec. 250.90(d)(2), but such a seller still may not charge its associate more than a fair market price. 17 C.F.R. Sec. 250.92(b).
 
 
 6
 Under the concurrently enacted provisions of the FPA, FERC regulates the justness and reasonableness of wholesale rates for electric power in interstate commerce. 16 U.S.C. Secs. 824, 824d, 824e.[2] FERC's authority includes the power to determine that a "contract affect[ing]" such a rate is "unjust, unreasonable, unduly discriminatory or preferential" and to prescribe a just and reasonable contract. 16 U.S.C. Sec. 824e(a). Section 318 of the FPA provides that, in the absence of an SEC-granted exemption, the requirements of PUHCA govern when a company is subject both to a requirement of the SEC-administered PUHCA (including rules, regulations, and orders thereunder) "with respect to [an itemized list not at issue here] or any other subject matter" and of the FERC-administered FPA (including rules, regulations, and orders thereunder) "with respect to the same subject matter." 16 U.S.C. Sec. 825q (emphasis added).
 
 B. OPCO, SOCCO, and the SEC
 
 7
 Petitioner Ohio Power Company (OPCO) is an operating public utility subsidiary of American Electric Power Company, Inc. (AEP), a public utility holding company subject to PUHCA. OPCO purchases coal from its wholly-owned subsidiary Southern Ohio Coal Company (SOCCO) on essentially a cost-pass-through basis. Because both are associates of a public utility holding company, it is unquestioned that the coal-sale transactions between OPCO and SOCCO are subject to SEC jurisdiction under section 13(b).
 
 
 8
 The SEC has issued four orders that touch on the price of the OPCO-SOCCO coal transactions. Ohio Power Company, Holding Co. Act Release No. 17,383 (Dec. 2, 1971), permitted OPCO to inject capital into the corporate shell of SOCCO so SOCCO could develop OPCO-owned coal reserves "to assure a reliable supply of coal." Id. The SEC noted that, under the proposal before it, SOCCO's charges to OPCO would be "based on" its actual costs plus a rate of return on capital no greater than that approved for OPCO by the Federal Power Commission, FERC's statutory predecessor. Id. at 2. There were no hearings and no findings, other than the ultimate finding that the proposed transaction was in the interest of the public, investors, and consumers. The order concluded with a "proviso that nothing in this order shall be construed as in any manner affecting the jurisdiction of any other regulatory authority with respect to the accounting or similar matter in connection with the proposed transactions." Id. Ohio Power Company, Holding Co. Act Release No. 20,515, 14 S.E.C. Docket 928 (Apr. 24, 1978), approved OPCO's sale of its coal mines and leases to SOCCO and its further capital contribution to SOCCO. Again, the SEC stated that "[t]he price at which SOhio [SOCCO] coal is sold to AEP system companies will not exceed the cost thereof to the seller." Id. at 929.
 
 
 9
 The SEC required both OPCO and SOCCO to file quarterly financial statements and statements setting out "the quantities of coal sold to each buyer, the price of such coal and the method used to compute the cost of coal sold." Id. at 930. Southern Ohio Coal Co., Holding Co. Act Release No. 21,008, 17 S.E.C. Docket 310 (Apr. 17, 1979), approved borrowings by SOCCO intended to reduce the cost of coal by providing cheaper capital. Southern Ohio Coal Co., Holding Co. Act Release No. 21,537, 19 S.E.C. Docket 1309 (Apr. 25, 1980), approved additional OPCO investment in SOCCO to finance capital improvements expected to reduce the cost of coal to SOCCO's buyers. As in the previous decisions, the last order adverted briefly to the contractual relation between the associates: "The price at which [SOCCO's] coal will be sold to AEP system companies will not exceed the cost thereof to the seller. For this purpose, cost will include reasonable compensation for necessary capital." Id. The SEC cited sections 6, 7, 9, 10, and 12 of PUHCA, 15 U.S.C. Secs. 79f, 79g, 79i, 79j, 79l, as authority for its various orders. None of the orders cite section 13(b) as authority.
 
 C. The Decision Below
 
 10
 The present dispute arose in a rate proceeding initiated in 1982. All issues settled except the extent to which OPCO could include its costs for "captive coal" purchased from SOCCO in its recoverable cost of service. Ohio Power Co., 39 F.E.R.C. p 61,098, at 61,274 (1987). The Administrative Law Judge (ALJ) determined that section 318 and FERC's own regulations did not bar FERC's examination of the reasonableness of OPCO's captive coal purchases and that OPCO's coal costs had not been shown to be unreasonable. Id. at 61,275. The full Commission affirmed the ALJ's determination that the reasonableness of OPCO's captive coal costs were subject to review but determined that the price of the captive coal unreasonably exceeded a comparable market price. Id.
 
 
 11
 On the threshold section 318 issue, the ALJ had reasoned that the SEC's regulation of the "intra-corporate price of [captive] coal" was not the "same subject matter," in the section 318 sense, as FERC's regulation of utility rates. Id. at 61,276. FERC agreed for two reasons. First, FERC questioned whether the SEC had set the price of captive coal at cost, since it was "not clear" that the SEC statements regarding whether the price would be "based on" and "not exceed" cost had mandated a cost floor as well as ceiling. Id. FERC also cited the SEC's Rule 92, 17 C.F.R. Sec. 250.92, prohibition of inter-associate sales of goods "at a price which exceeds the price at which the purchasers might reasonably be expected to obtain comparable goods elsewhere," which FERC interpreted as indicating that the SEC might require a below-cost market price, id., and SEC authority for above-cost market prices, id. at 61,290 n. 17. FERC indicated that OPCO might apply this authority to the SEC for a market-based section 13 price.
 
 
 12
 Second, FERC reasoned that setting the inter-associate price, assuming the SEC had in fact done that, simply was not "the same subject matter," in the section 318 sense, as setting wholesale utility rates and determining what costs may be recovered therein. Id. at 61,276-77. FERC cited in support SEC staff disclaimers that SEC section 13(b) orders set rates and an SEC section 13(b) exemption decision that purportedly recognized FERC's rate-making power to allow utilities within its jurisdiction to recover either SEC-authorized costs "or some other amount." Id. at 61,277 (quoting New England Electric System, Holding Co. Act Release No. 22,309, 24 S.E.C. Docket 298, 307-08 (Dec. 9, 1981)).
 
 
 13
 The SEC has not appeared in this cause.
 
 II. ANALYSIS
 A. Statutory Interpretation
 
 14
 Before undertaking our analysis of FERC's interpretation of section 318, we note that FERC does not claim for its interpretation the deference to administrative agencies mandated by Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), nor is such deference warranted. While Chevron requires us to defer to "an agency's construction of the statute which it administers," id. at 842, 104 S.Ct. at 2781, "when an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is entitled to no deference," Department of Treasury v. FLRA, 837 F.2d 1163, 1167 (D.C.Cir.1988). Section 318 cannot be said to be entrusted to FERC's administration. Certainly it involves FERC, but only to the extent of FERC's interface with regulation of the regulated entities by the SEC under PUHCA. Therefore, FERC has rightly claimed no deference for its interpretation, and we afford none.
 
 
 15
 FERC's statutory interpretation rested on two rationales: (1) that there is no conflict between the approaches of the SEC and FERC and (2) that the same subject matter is not involved. We discuss these in the order of their acknowledged importance.
 
 1. The Subject Matter Involved
 
 16
 FERC primarily relied on its determination that its decision and the SEC's decisions do not deal with "the same subject matter" because FERC is regulating rates whereas the SEC is regulating inter-associate transactions. Section 318 governs conflicts regarding "the issue, sale, or guaranty of a security, or assumption of obligation or liability in respect of a security, the method of keeping accounts, the filing of reports, or the acquisition or disposition of any security, capital assets, facilities, or any other subject matter." 16 U.S.C. Sec. 825q. FERC suggests in this Court that the present subject is somehow not a subject within the contemplation of section 318 because Congress enumerated certain matters in section 318 with respect to which the SEC has jurisdiction under PUHCA, see 15 U.S.C. Secs. 79f-79g, 79i-79j, 79n-79o, but did not mention the non-enumerated subject under discussion.
 
 
 17
 We cannot accept this suggestion. Congress concluded its enumeration in section 318 with the phrase "or any other subject matter," and the inclusiveness of these words cannot be avoided, as FERC would have us do, by speculating that "Congress simply wanted to include a provision that would cover some unanticipated 'conflict' that might arise." Brief for Respondent at 21 n. 21. The price term of sales contracts between associated companies are subject to SEC jurisdiction under PUHCA, just as are the enumerated subjects, and are therefore a "subject matter" under section 318 if such price term is also subject to the requirements of the FPA or of FERC's rules, regulations or orders thereunder. 16 U.S.C. Sec. 825q. FERC has in effect set by order a different price term for such a contract by determining that it will not allow the contract price as a cost in OPCO's rate case. See Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 971, 106 S.Ct. 2349, 2359, 90 L.Ed.2d 943 (1986). The conclusion that the same subject matter is implicated is inescapable. Nor can we subscribe to FERC's analysis that the same subject matter is not involved because it sets rates and the SEC does not. Simply put, FERC's reasoning proves too much because under such an analysis there could never be a conflict between the SEC and FERC with respect to a matter not specifically enumerated in section 318. The absence of conflict would not be malum in se, of course, but we presume Congress contemplated that in fact it had conferred on the SEC jurisdiction over some non-enumerated matters that otherwise would fall within the jurisdiction of FERC, and it therefore included the residuary phrase in section 318 to govern those conflicts. FERC's reading renders the residuary language of section 318 meaningless to that extent, and such constructions are disfavored. See, e.g., National Ass'n of Recycling Indus. v. ICC, 660 F.2d 795, 799 (D.C.Cir.1981). In addition, we note that the Supreme Court has held in an analogous situation that a state's "undoubted jurisdiction over retail rates" does not empower it to redetermine issues underlying FERC-set wholesale rates. Nantahala Power & Light, 476 U.S. at 970, 106 S.Ct. at 2358.
 
 
 18
 Moreover, the purposes for which the SEC is to exercise jurisdiction are not as limited as FERC describes them. The ALJ, whose reasoning was affirmed by FERC, 39 F.E.R.C. at 61,275, described the SEC's purposes as ensuring "that no one of the associated companies takes advantage of any other," Ohio Power Co., 25 F.E.R.C. p 63,060, at 65,183 (1983), and "keeping a reasonable arm's length relationship between the two associated companies." Id.
 
 
 19
 These are true statements as far as they go, but they disregard the SEC's statutory charge to exercise its power in the interest of consumers, as well as of investors and the public, and "to insure that such contracts are performed economically and efficiently," as well as "at cost." 15 U.S.C. Sec. 79m(b) (emphasis added). Whether and how well the SEC has discharged the full scope of its statutory duties was not before FERC and is not before us. It is sufficient for present purposes that the SEC is charged by the statute with regulating the terms of affiliate contracts in the interest of consumers, as well as investors and the public, and has not exempted the instant contract. Moreover, we observe, such purposes as the ALJ imputed to the SEC are barely distinguishable, if at all, from considerations cited by FERC itself in favor of a market test: "protection from the prospect of self dealing," and "a substitute for ... arms-length negotiations." 39 F.E.R.C. at 61,279. The "economic efficiency" FERC seeks to promote by the market test, id., echoes the "economically and efficiently" language of section 13(b) itself. The market and at-cost tests thus seem simply different means to the same end. When Congress enacted PUHCA, however, it specified a particular means to that end for companies subject to PUHCA, and neither we nor FERC are empowered to overrule that express legislative choice for companies within the jurisdiction of the SEC.
 
 
 20
 We are not persuaded otherwise by the ambiguous disclaimers of rate-setting authority by the SEC and its staff quoted by FERC in its opinion. See 39 F.E.R.C. at 61,277-78. The SEC clarifies nothing we need to understand by disclaiming "rate-making" authority: plainly, that is not its statutory mandate nor the issue here. The issue is the effect to be given in a rate-making proceeding to the SEC's price-term regulation. The statement of the SEC staff has little weight, but we note it asserts that the SEC does fix a pricing formula and refers to the intermediate steps between its decision and ratemaking in a manner that suggests that the SEC's staff believes that FERC is free to set rates based on other considerations. 39 F.E.R.C. at 61,277. Cf. Nantahala Power & Light, 476 U.S. at 967-68, 106 S.Ct. at 2357-58. The SEC staff also stated that FERC " 'has jurisdiction to try issues, both of fact and of interpretation, in applying such orders, insofar as material, to a particular rate case,' " 39 F.E.R.C. at 61,277,[3] but that too is not dispositive of the present question because it does not speak--by its own terms, could not speak--to what considerations govern the effect FERC is to give the SEC's determination.
 
 
 21
 The purported disclaimer by the SEC itself similarly fails to speak clearly, if at all, to the question before FERC and before us. In New England Electric System, Holding Co. Act Release No. 22,309, 24 S.E.C. Docket 298 (Dec. 9, 1981), the SEC had before it New England Power Company's (NEPCO) application for a section 13(b) exemption for the proposed future charter of a collier then under construction. In the paragraphs quoted by FERC, 39 F.E.R.C. at 61,277-78, the SEC determined that it could not then assess whether the complex pricing provisions of the future, twenty-five year charter would conform with section 13(b)'s at-cost requirements. On the other hand, the SEC decided that it would not retain jurisdiction because "other regulatory effects ... allay our concern." 24 S.E.C. Docket at 307. Specifically, the SEC referred to FERC's FPA jurisdiction: "The rates allowed to NEPCO include, as a cost of service, its cost of fuel, which as allowed to NEPCO may include either the entire cost of transportation under the joint venture's charter to NEPCO, if FERC should determine that it is just and reasonable, or some other amount." Id. at 308. Because the case clearly is an exemption case, however, it is unclear whether the SEC was stating (1) its understanding that SEC at-cost determinations are irrelevant to FERC rate-setting determinations or (2) the effects that would follow upon its granting of the exemption and the consequent lifting of whatever bar section 318 might otherwise impose. Because an exemption by the SEC lifts the bar of section 318 to action by FERC, 16 U.S.C. Sec. 825q, we are not persuaded that the decision supports the proposition that FERC may use "some other amount" when the SEC does not grant exemption from the cost standard.
 
 
 22
 The clearest statement by anyone associated with the SEC on the effect, in the absence of an exemption, of SEC section 13(b) determinations on FERC rate determinations that has been brought to our attention is the prepared statement of the SEC submitted to a congressional committee contemplating amendment of PUHCA. The statement, which advocated repeal of PUHCA, referred to FERC's adoption of a market test for affiliate contracts, the SEC's understanding that section 13 requires a cost standard for such transactions, and the SEC's conclusion that therefore a different federal standard applied to those companies associated with public utility holding companies than applied to those not so associated. The Public Utility Holding Company Act of 1935: Hearings on H.R. 5220, H.R. 5465 and H.R. 6134 before the Subcommittee on Energy Conservation and Power of the Committee on Energy and Commerce, House of Representatives, 97th Cong., 2d Sess., at 582-83 (1982). (The SEC's recommendation to repeal PUHCA, of course, was not enacted.)
 
 
 23
 Finally in this respect, we note that FERC properly has abandoned in this Court its citation below, 39 F.E.R.C. p 61,098, at 61,290 n. 18 & accompanying text at 61,277, of Mississippi Indus. v. F.E.R.C., 808 F.2d 1525, 1550-51 (D.C.Cir.1987) (per curiam), as authority for its jurisdiction in the present case. The contracts at issue there were characterized as contracts for the sale of electricity between associated companies and therefore outside the scope of the SEC's jurisdiction. See id.; compare 15 U.S.C. Sec. 79m(b) with 15 U.S.C. Sec. 79b(a)(20).
 
 2. The Existence of Conflict
 
 24
 FERC's first-stated, but less important, rationale was that no jurisdictional conflict arises because the SEC may require market pricing and "it is not clear," 39 F.E.R.C. at 61,276, that the SEC's orders in the present case impose a cost floor as well as a cost ceiling. As to the first contention, FERC cites the SEC's Rule 92, which provides that the price for seller-produced goods between associated companies may not exceed "the price at which the purchaser might reasonably be expected to obtain comparable goods elsewhere." 17 C.F.R. Sec. 250.92. As to the second, FERC's opinion notes that the SEC orders never state that SOCCO's price must equal cost, only that it will be "based on" and "not exceed" cost. In this Court, FERC points additionally to the boiler-plate character of the language in the SEC orders regarding the interest of the public, investors, and consumers; to the absence of any findings by the SEC on the reasonableness of the SOCCO-OPCO charges; to the absence of any findings that the coal price should be passed through to rate payers; and to the absence of evidence that the SEC was "closely monitoring" all costs to ensure efficiency.
 
 
 25
 We cannot accept this rationale either because it proceeds from a false premise that the bar of section 318 applies only when there is a present conflict between SEC and FERC prescriptions. The language of section 318 in fact bars FERC jurisdiction whenever a person is "subject ... to a requirement," 16 U.S.C. Sec. 825q, of PUHCA. OPCO plainly is so subject to section 13(b) with respect to its contractual relations with SOCCO. The fact that FERC's market approach produces a current result that does "not exceed" cost, in the words of the SEC's 1978 and 1980 orders, does not make OPCO any less subject to section 13(b) or to the SEC's orders. In the absence of exemption, it is for the SEC rather than FERC to determine the inter-associate price.
 
 
 26
 FERC suggests that OPCO may apply to the SEC for approval of a market-based rate. 39 F.E.R.C. at 61,290 n. 17. The suggestion is not well-taken because it reverses Congress's section 318 decision that the SEC has the right of first refusal, as it were, in making such determinations. The statutory scheme simply does not contemplate that FERC will make the determination and then send the subject company to the SEC for a conforming order.
 
 
 27
 Although it does not affect our decision, we must agree with FERC that it is "not clear" from the orders in question that the SEC was particularly mindful of its statutory powers and obligations under section 13(b). The SEC orders devoted some attention to the cost of capital to SOCCO and to the cost of coal to that extent. But it is only to that extent that any concern with the cost of coal is evident. None of the four orders cites section 13, nor mentions expressly whatever purchase agreement exists between SOCCO and OPCO, nor describes any element of costs other than the cost of capital. We note that section 13(b) and the SEC's regulations thereunder do not appear to require submission of and approval of inter-associate agreements but only conformity of the same with the SEC-promulgated rules. Accordingly, OPCO's assertion that the SEC "approved" the sales agreement between OPCO and SOCCO is problematic, and the references in the orders are consistent with, and may be no more than, references in passing to SOCCO's apparent election of, and unexamined representations of conformity with, the Rule 91 at-cost method. We also note, however, that Rules 90 and 91 are regulations under section 13(b) and as binding thereunder as an individualized order. We note as well that the SEC's 1978 Order did require OPCO to submit quarterly reports on the price of coal and how the price was computed. All these matters taken into account, our decision nevertheless rests on the threshold matter of the language of the statute, which commits the determination of the inter-associate price to the SEC. Whether the SEC acquits itself well or ill is not our present concern.
 
 B. Trapped Costs
 
 28
 Although based upon the language of the statute, our decision is also informed by consideration of the consequences of FERC's action in effectively prescribing an inter-associate price. Accordingly, our decision is buttressed by the consistency of its consequences with Supreme Court precedents that disfavor conflicting regulation resulting in trapped costs. In Nantahala Power & Light, the Supreme Court held that it was impermissible for a retail-rate-setting state utility commission to "trap" costs by making a different allocation between related companies of a fixed quantity of low-cost power than had FERC at the wholesale level. 476 U.S. at 970-71, 106 S.Ct. at 2358-59. (The PUHCA was not involved.) In a passage that is particularly instructive, the Court indicated that
 
 
 29
 FERC's failure actually to reform the AA [the agreement between the related companies] does not materially alter [the] analysis. FERC ordered Nantahala to adjust its wholesale rates so that its average cost per unit of power reflected an allocation of [low-cost] entitlements power different from the allocation set forth in the AA. The effect of that order is, for purposes of this case, essentially the same as reformation of the agreement itself.... By adopting a different allocation, NCUC [the state agency] imputes to Nantahala a different average cost of power, notwithstanding the fact that, under the AA, Nantahala unquestionably is not entitled to demand that [allocation]. Consequently, Nantahala is exposed to "trapped" costs. It must, under NCUC's order, pretend that it is paying less for the power it receives from TVA, under agreements not subject to NCUC's jurisdiction, than is in fact the case.
 
 
 30
 Id. at 971, 106 S.Ct. at 2359. Although the parallels to the present case are not precise, there are two quite clear lessons in the passage: First, it is sufficient that FERC's action in the present case reforms the agreement between OPCO and SOCCO in effect rather than in fact. Second, the cost-trapping "pretense" occasioned thereby is prohibited. In the case of Mississippi Power & Light Co. v. Mississippi ex rel. Moore, --- U.S. ----, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988), FERC had allocated responsibility for purchasing the expensive power generated by the Middle South Utilities system's Grand Gulf 1 nuclear power plant among the system's multiple operating companies on a certain basis. The State of Mississippi, however, claimed the power to disregard FERC's determination with respect to the operating company within its jurisdiction because FERC had not actually considered the prudence of building Grand Gulf 1 and therefore had not preempted Mississippi's power to do so. The Supreme Court held that Nantahala Power & Light controlled and preemption did not turn on whether the particular matter of prudence was actually decided by FERC. 108 S.Ct. at 2438-42.
 
 
 31
 Given the clear and express statutory allocation of jurisdiction between federal agencies in section 318, Nantahala Power & Light and Mississippi Power & Light are not distinguishable from the present circumstances simply because they involved state-federal relations or because FERC must be re-cast in the role of the respective states with the SEC taking the role formerly played by FERC. As FERC points out, however, the Court did not rule in either Nantahala Power & Light or Mississippi Power & Light on the authority of a state (and by analogy, FERC in the present circumstances) to second-guess the utility on the quantity of price-regulated power it should have purchased when cheaper power was available. 476 U.S. at 972, 106 S.Ct. at 2359; 108 S.Ct. at 2440. That question has been answered favorably to a state (and, by analogy, favorably to FERC in the present circumstances) in Kentucky West Virginia Gas Co. v. Pennsylvania Pub. Util. Comm'n, 837 F.2d 600, 606-11 (3d Cir.1988). We have no occasion to consider this rationale, however. It plainly was not part of FERC's analysis below, and an agency's order must be affirmed on the basis stated in its opinion or not at all. Federal Power Comm'n v. Texaco Inc., 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974).
 
 
 32
 FERC also argues that there is no "trapping" because FERC has stated that it will allow OPCO to recover in its rates, when the facts warrant, a fair market value for its captive coal in excess of its costs therefor. See Public Serv. Co. of N.M., 17 F.E.R.C. p 61,123 (1981) (Opinion No. 133), aff'd in pertinent part sub nom. Public Serv. Co. of N.M. v. FERC, 832 F.2d1201 (10th Cir.1987) (non-SEC case). The difficulty with this element of FERC's argument--and indeed with its present attempt to impose a market-based approach on petitioner's transactions--is that FERC does not, and apparently cannot, explain how OPCO can recover in its rates such a fair market value in excess of cost without running afoul of the SEC's bar in 17 C.F.R. Sec. 250.90(a)(2). See supra p. 4. In other words, if we adopt FERC's approach, OPCO faces a tails-we-lose situation when FERC finds that fair market value dictates a captive coal level cost but is prevented by SEC regulation from winning when the other side of the coin comes up. Therefore, attractive as FERC's market approach may be in general, its application to the PUHCA-regulated petitioner adds nothing to FERC's argument in the present case.
 
 III. CONCLUSION
 
 33
 For the reasons given above, we vacate and remand the decision of FERC. We would like to clarify that there are two issues which we do not address. First, we do not hold that OPCO and SOCCO or any other SEC-regulated companies are entitled to pay and receive a price in excess of market. See 17 C.F.R. Sec. 250.92. Second, we do not hold that FERC may not apply a market test to contracts between related companies that are subject to its jurisdiction but not that of the SEC. See Public Serv. Co. of N.M., 832 F.2d at 1201. We hold only that the statute commits to the SEC such determinations regarding companies associated with a public utility holding company. Basing our decision as we do on this threshold issue, we have no occasion to reach the further issues raised by the petition.
 
 
 34
 Granted.
 
 MIKVA, Circuit Judge, concurring:
 
 35
 I fully agree with my colleagues that the Federal Energy Regulatory Commission ("FERC") may not escape the strictures of section 318 of the Federal Power Act ("FPA"), 16 U.S.C. Sec. 825q, simply by claiming that it and the Securities and Exchange Commission ("SEC") are not regulating "the same subject matter," for it is clear that both agencies have ruled on the price of coal between Ohio Power Company ("Ohio Power") and its subsidiary, Southern Ohio Coal Company ("Southern Ohio"). See Majority Opinion ("Maj. Op.") at 1405-1408.
 
 
 36
 In my view, however, for section 318 to divest FERC of jurisdiction, a person must also be subject to conflicting requirements of the Public Utility Holding Company Act ("PUHCA"), 15 U.S.C. Secs. 79 et seq., and the FPA. I base this conclusion not only on the text of the statute, but also because section 13 would otherwise serve no purpose. Applying this interpretation to the case sub judice, I am not convinced that the SEC's orders (under the PUHCA) and FERC's decision (under the FPA) are in conflict. Accordingly, I would uphold FERC's determination that section 318 does not bar its jurisdiction in this case.
 
 
 37
 I concur in the judgment of my colleagues, however, and would grant the petition for review, on the alternate ground that FERC's decision is contrary to section 35.14(a)(7) of its own regulations, 18 C.F.R. Sec. 35.14(a)(7).
 
 I.
 
 38
 Section 318 of the FPA provides in relevant part:If, with respect to the issue, sale, or guaranty of a security, * * * or the acquisition or disposition of any security, capital assets, facilities, or any other subject matter, any person is subject both to a requirement of the Public Utility Holding Company Act of 1935 * * * and to a requirement of this chapter * * *, the requirement of the Public Utility Holding Company Act of 1935 shall apply to such person, and such person shall not be subject to the requirement of this chapter * * * with respect to the same subject matter, unless the Securities and Exchange Commission has exempted such person from such requirement of the Public Utility Holding Company Act of 1935, in which case the requirements of this chapter shall apply to such person.
 
 
 39
 16 U.S.C. Sec. 825q (emphasis added). As I parse this provision, there is a jurisdictional conflict (and FERC must yield jurisdiction to the SEC) if, and only if, a person is subject to a conflicting "requirement" of both PUHCA and the FPA, and the requirements are "with respect to the same subject matter." The first condition is a logical necessity, for even if there is dual jurisdiction over "the same subject matter" (the second condition), if there is no conflict, then there is no need for FERC to yield to the SEC.
 
 
 40
 As noted above, I agree with my colleagues that the second condition has been met in this case: FERC and the SEC are clearly regulating the same subject matter, namely, the price of coal between Ohio Power and Southern Ohio. I am not so sure, however, that there is a conflict between the relevant SEC orders and FERC's decision below.
 
 
 41
 In 1971, the SEC (pursuant to the PUHCA) authorized the formation of Southern Ohio on the condition, inter alia, that "[t]he charges for coal by Southern Ohio will be based on an amount equal to the actual cost of Southern Ohio in developing the reserve and mining such coal, * * *." Ohio Power Co., Release No. 17,383, at 2 (Dec. 2, 1971) (SEC) (emphasis added). In its 1978 order approving the transfer of certain mine and other coal properties from Ohio Power to Southern Ohio, the SEC further stated that "[t]he price at which SOhio coal is sold to AEP System companies will not exceed the cost thereof to the seller." Ohio Power Co., Release No. 20,515, 14 SEC Docket 928, 929 (Apr. 24, 1978) (emphasis added).
 
 
 42
 In the decision below, FERC (pursuant to the FPA) ruled that, based on the market price for comparable coal, the price Ohio Power paid for Southern Ohio coal was unreasonably high; FERC therefore disallowed Ohio Power's request for a rate increase based on those costs. 39 FERC p 61,098, at 61,285-86 (1987), reh'g denied, 43 FERC p 61,046 (1988).
 
 
 43
 In this petition, Ohio Power maintains that there is a jurisdictional conflict by arguing (and, incidentally, implicitly conceding that section 318 requires a conflict) that section 13(b) of the PUHCA, 15 U.S.C. Sec. 79m(b), mandates a cost standard and that, in any event, the SEC in this case required Southern Ohio to set its price at cost. I disagree.
 
 
 44
 Although section 13(b) includes the phrase "at cost," Congress intended section 13(b) to avoid "excessive charges" resulting from the lack of arm's-length bargaining and open competition between public utility holding companies and their subsidiaries. PUHCA Sec. 1(b)(2) (emphasis added), 15 U.S.C. Sec. 79a(b)(2); see also North American Co. v. SEC, 327 U.S. 686, 701 & n. 11, 66 S.Ct. 785, 794 & n. 11, 90 L.Ed. 945 (1946) (citing congressional findings underlying section 1(b)). The SEC has interpreted section 13(b) to mean that "[n]o subsidiary company of a registered holding company * * * shall perform any service or construction for, or sell any goods to, any associate company therefore, or enter into any contract to do so, at more than cost * * *." 17 C.F.R. Sec. 250.90(a)(2) (emphasis added). Indeed, the SEC even permits a market-price test for the sale of goods between such affiliates. See 17 C.F.R. Sec. 250.92(b). I cannot conclude that section 13(b) necessarily mandates strict at-cost pricing between public utility holding companies and their associates.
 
 
 45
 Ohio Power also argues that, in any event, the SEC did not authorize a market approach in this case. But this argument is misplaced, for the issue is whether there is a conflict in requirements under the two statutes. Because the SEC in 1978 limited the price of coal only to cost as a ceiling, see Ohio Power Co., Release No. 20515, 14 SEC Docket 928, 929 (Apr. 24, 1978), I find no conflict between that requirement and FERC's requirement that Ohio Power pay market price, where, as in this case, the market price is less than cost. The SEC's 1971 order is not to the contrary, for it requires only that the price be "based on" cost; the later order imposing cost as a ceiling is certainly "based on" cost.
 
 
 46
 Moreover, as my colleagues note, see Maj. Op. at 1408-09, the SEC's approval of the various transactions was grounded on the financial aspects of the corporate arrangements, not on the reasonableness of the price paid for the coal. Ohio Power therefore reads too much into the SEC orders when it claims that the SEC expressly conditioned its approval of the affiliate arrangement on a strict cost-based standard--Ohio Power relies too heavily on what seems to be merely boilerplate language. Accordingly, because I read the SEC's orders to permit Ohio Power to pay less than cost for the coal, FERC's imposition of a market price less than cost does not in this case create a jurisdictional conflict. As FERC stated below: "it is not clear that the SEC requires Ohio Power to purchase coal from its subsidiary at cost, rather than at market price. The SEC orders which Ohio Power cites for this proposition * * * do not appear to mandate the cost-based price where a market price would be lower, rather they permit a price up to a cost-based price." 39 FERC at 61,276.
 
 
 47
 In short, although Ohio Power has met the second condition of section 318 (both agencies are regulating the "same subject matter," namely, the reasonableness of the price paid), it has not met the first. Under the facts of this case, the SEC has not precluded a price less than cost; FERC's setting of the allowable price at a market price less than cost therefore does not create a conflict that would bring section 318 into play.
 
 
 48
 I note in passing that, under my view, if FERC had sought to impose a price higher than cost (i.e., if the market price determined by FERC were higher than cost), then FERC's requirement would clearly conflict with the SEC's requirement and, under section 318, FERC would have to abide by the SEC's determination. This implies that, in a case where the SEC has set cost as a ceiling, FERC has jurisdiction to impose a market price only if that price is less than cost. FERC in dictum below, however, would have permitted Ohio Power to recover the market price even if that price exceeded cost. See 39 FERC at 61,287-88. Although this is a problematic aspect of the decision below, we need not pass on its validity under section 318, for that case is simply not before us today.
 
 II.
 
 49
 Ohio Power argues in the alternative that, even if section 318 does not apply, section 35.14(a)(7) of FERC's own rules bars it from imposing its market-price test. I would agree and grant the petition on this ground.
 
 
 50
 Section 35.14(a)(7), which governs fuel price adjustment clauses in filed rate schedules, provides in pertinent part:
 
 
 51
 Where a utility purchases fuel from a company-owned or controlled source, the price of which is subject to the jurisdiction of a regulatory body, such cost shall be deemed to be reasonable and includable in the adjustment clause.
 
 
 52
 18 C.F.R. Sec. 35.14(a)(7) (emphasis added). There is no dispute that this rule applies to the transaction in this case; the only issue on appeal is the meaning of the word "deemed." FERC, affirming the administrative law judge on this point, found that the regulation creates only a rebuttable presumption of reasonableness. See 39 FERC at 61,287-88. Ohio Power challenges this conclusion, arguing that the word "deemed" establishes instead a conclusive presumption.
 
 
 53
 The applicable standard of review is clear. Although a reviewing court must defer to an agency's interpretation of its own rules, see Western Union Telegraph Co. v. FCC, 815 F.2d 1495, 1503 (D.C.Cir.1987), no deference is owed an interpretation at odds with the plain meaning of the text, see Union of Concerned Scientists v. NRC, 711 F.2d 370,381 (D.C.Cir.1983) ("When an agency's interpretation flies in the face of the language of the rules themselves, it is owed no deference.").
 
 
 54
 Although the provision at issue has apparently not been interpreted in any published opinion, courts construing the word "deemed" have generally found that it establishes a conclusive presumption. See H.P. Coffee Co. v. Reconstruction Finance Corp., 215 F.2d 818, 822 (Emer.Ct.App.1954) (finding "almost unanimous judicial determination that the word ['deemed'], when employed in statutory law, creates a conclusive presumption") (citing cases); see also Dameron v. Brodhead, 345 U.S. 322, 326-27, 73 S.Ct. 721, 723-24, 97 L.Ed. 1041 (1953) (rejecting, in a case involving state taxation of a serviceman's personal property, the argument that "deemed" implies a rebuttable presumption, because such a construction would nullify the statute); Kyzar v. Califano, 597 F.2d 68, 71 (5th Cir.1979) (where statute provided that an insured child is "deemed dependent" upon a stepparent if the child was living with the stepparent at the time of death of the natural parent, Congress intended that dependency would be conclusively established upon proof of the objective criteria); Kohn v. Myers, 266 F.2d 353, 357 (2d Cir.1959) ("The word 'deemed' gives rise to a conclusive presumption or substantive rule of law that the acquisition of assets from a bankrupt after a petition of bankruptcy is filed is not in good faith if the transferee knew the petition was pending and did not have reasonable cause to believe that it was not well founded."). Numerous state court decisions, too many to list here, are in accord.
 
 
 55
 Moreover, if the intent of the regulation were to create a rebuttable presumption, as FERC now contends, then the rule would be superfluous, for it has long been settled that a utility's costs are presumed (subject to rebuttal) to be prudently incurred. See Missouri ex rel. Southwestern Bell Telephone Co. v. Missouri Pub. Serv. Comm., 262 U.S. 276, 289 n. 1, 43 S.Ct. 544, 547 n. 1, 67 L.Ed. 981 (1923); Anaheim v. FERC, 669 F.2d 799, 809 (D.C.Cir.1981).
 
 
 56
 The history of section 35.14(a)(7) also supports Ohio Power's reading of the provision, for FERC has twice proposed and rejected a different rule to accomplish the result that it now claims flows from the existing rule. First, as originally proposed by the Federal Power Commission ("FPC") in 1973, the regulation did not contain the "deemed" language:
 
 
 57
 Where the cost of fuel includes fuel from company owned or controlled sources, that fact shall be noted and described as part of any filing. Only the reasonable cost of such fuel may be included. Amounts collected from customers in excess of such reasonable cost shall be subject to refund.
 
 
 58
 38 Fed.Reg. 17,253 (1973) (emphasis added). Only the unitalicized sentence has been retained in the current regulation. After public comment, the second and third sentences were modified to its current version:
 
 
 59
 Where the cost of fuel includes fuel from company-owned or controlled sources, that fact shall be noted and described as part of any filing. Where the utility purchases fuel from a company-owned or controlled source, the price of which is subject to the jurisdiction of a regulatory body, such cost shall be deemed reasonable and includable in the adjustment clause. * * * Fuel charges which do not appear to be reasonable may result in the suspension of the fuel adjustment clause or cause an investigation thereof to be made by the Commission on its own motion under section 206 of the Federal Power Act.
 
 
 60
 39 Fed.Reg. 28,911 (1974) (emphasis added). When the rule was eventually promulgated, the FPC explained that "[t]he modification provide[s] that when a utility purchases fuel from an owned or controlled source and the price is subject to the jurisdiction of a regulatory body, the cost of the fuel may be included in the fuel adjustment clause." 39 Fed.Reg. 40,58 3 (1974) (emphasis added). The addition of the "deemed" language suggests, albeit weakly, that the prior version, which was rejected and which provided no special treatment for affiliate fuel purchases subject to the jurisdiction of another regulatory body, would have accomplished the result FERC now seeks to impose.
 
 
 61
 Second, in 1979 FERC proposed to amend section 35.14(a)(7) to require utilities to file, as rate schedules, all contracts for fuel purchases from company-owned or company-controlled sources, regardless of whether the price was subject to the jurisdiction of a regulatory body. See 44 Fed.Reg. 28,68 3 (1979). The stated purpose of this proposal was "to further aid the Commission in fulfilling its responsibility to ensure that utilities are purchasing fuel at reasonable prices and that only allowable costs are being passed through in the fuel cost adjustment clause." Id. at 28,684; see also 45 Fed.Reg. 82,272 (1980). Although FERC later determined that its adoption of a market-price test for determining the reasonableness of affiliate fuel costs made the proposed revision unnecessary, see 50 Fed.Reg. 24,779 (1985), it is significant that FERC's proposal would have been superfluous had the provision already established merely a rebuttable presumption of reasonableness, because there would have been no question that FERC would have had independent jurisdiction to review the contracts.
 
 
 62
 FERC relies heavily on an interpretation of the section in a 1975 FPC chairman's letter to a Senate Subcommittee, but that letter is not persuasive. The letter merely states that section 35.14(a)(7) creates "a presumption of reasonableness" without specifying whether the presumption is rebuttable or conclusive. The Utility Act of 1975: Hearings on S. 594 Before the Subcomm. on Intergovernmental Relations, Senate Comm. on Government Operations, 94th Cong., 1st Sess. 500, 514 (1975).
 
 
 63
 Finally, FERC argues that its statutory mandate to ensure that rates are just and reasonable implies that section 35.14(a)(7) cannot be read to foreclose FERC from independently determining the reasonableness of wholesale utility charges. But this argument is valid only if one ignores section 35.14(a)(7). Although, as a general matter, FERC may have the authority to make an independent determination of reasonableness, section 35.14(a)(7) forecloses such a route to the extent that the price is already subject to the jurisdiction of another regulatory body. In other words, section 35.14(a)(7) establishes, as a policy matter, that if another regulatory body has already passed on the fuel price, then FERC will abide by that determination. This reading is entirely consistent with the purpose of section 35.14(a)(7), which is to avoid unreasonable fuel costs between affiliated companies, for if another agency (e.g., the SEC) has already made that determination, then there is no reason for FERC to second-guess that decision.
 
 
 64
 * * *
 
 
 65
 * * *
 
 
 66
 I concur with my colleagues that the petition for review should be granted, but not on the basis of section 318 of the FPA. I do not find, in this case, a collision between the two agencies operating in this field. Rather, I would find that FERC erroneously construed section 35.14(a)(7) of its regulations to establish merely a rebuttable presumption of reasonableness. Under the regulation, because the prices of Ohio Power's fuel from its affiliate are subject to the jurisdiction of the SEC, such costs must be conclusively presumed reasonable.
 
 
 
 [1]
 The full text of section 13(b) is as follows:
 After April 1, 1936, it shall be unlawful for any subsidiary company of any registered holding company or for any mutual service company, by use of the mails or any means of instrumentality of interstate commerce, or otherwise, to enter into or take any step in the performance of any service, sales, or construction contract by which such company undertakes to perform services or construction work for, or sell goods to, any associate company thereof except in accordance with such terms and conditions and subject to such limitations and prohibitions as the [SEC] by rules and regulations or order shall prescribe as necessary or appropriate in the public interest or for the protection of investors or consumers and to insure that such contracts are performed economically and efficiently for the benefit of such associate companies at cost, fairly and equitably allocated among such companies. This provision shall not apply to such transactions as the [SEC] by rules and regulations or order may conditionally or unconditionally exempt as being necessary or appropriate in the public interest or for the protection of investors or consumers, if such transactions (1) are with any associate company which does not derive, directly or indirectly, any material part of its income from sources within the United States and which is not a public utility company operating within the United States, or (2) involve special or unusual circumstances or are not in the ordinary course of business.
 15 U.S.C. Sec. 79m(b).
 
 
 [2]
 This power originally resided in the Federal Power Commission, of which FERC is the successor agency. 42 U.S.C. Secs. 7172(a)(1)(B) & 7293 (1982)
 
 
 [3]
 Quoting "Comment of the Division of Corporate Regulation of the Securities and Exchange Commission on the Federal Energy Regulatory Commission Staff Preliminary Report of Investigation in FERC Docket No. E-9206, dated July 31, 1978."